Ernest Leon **DOWNS**, minor, by his parents and next friends, Wallace Downs and Emma Downs, Preston E. Knox, minor, by his parents and next friends, Everett Knox and Annabelle Knox, Shirley Phillips, minor, by her parents and next friends, Lee Phillips, Sr., and Ernestine Phillips, Lorraine Jackson, minor, by her parents and next friends, Lefelt Jackson and Lenora Jackson, George L. Boyd, minor, by his father and next friend, Thomas A. Boyd, Willene Bill, minor, by her mother and next friend, Luella Bill, Ronald Stephenson, minor, by his mother and next friend, Creadale Stephenson, Billy C. Gatson, minor, by his parents and next friends, Carlston Gatson and Zella R. Gatson, Mary Frances Carter, minor, by her parents and next friends, Frances Pollard and John Pollard, Linda Stuart, minor, by her parents and next friends, Joseph Stuart and Marilouise Stuart, Dwight C. Hatchett, minor, by his parents and next friends, Earia Hatchett, Sr., and Ella Mae Hatchett, Marvin Jackson, minor, by his parents and next friends, Andrew D. Jackson and Ella Mae Jackson, Tommie Lee Benson, minor, by his mother and next friend, Louise Benson, Carolyn Jean Miles, minor, by her parents and next friends, Jim Miles and Cleo Miles, Luther W. Peghee, Jr., minor, by his parents and next friends, Luther W. Peghee, Sr., and Lizzie Peghee, Appellants,

v.

The **BOARD OF EDUCATION OF KANSAS CITY,** of the State of Kansas, a corporation, Ralph Fulton, Roy Edwards, Jr., Joe Vaughan, Ralph Evans, Robert Fothergill and Lee C. Berns, Members of the Board of Education of the City of Kansas City, of the State of Kansas, F. L. Schlagle, Superintendent, G. W. Corporon, and William W. Boone, Appellees.

No. 7536.

United States Court of Appeals Tenth Circuit.

Sept. 25, 1964.

James P. Davis, Kansas City, Kan., and Robert L. Carter, New York City (Samuel C. Jackson, Topeka, Kan., Joan Franklin, Maria L. Marcus and Barbara A. Morris, New York City, on the brief), for appellants.

Willard L. Phillips, Kansas City, Kan. (P. B. McAnany, Thomas M. Van Cleave, Jr., James J. Lysaught, and John J. Jurcyk, Jr., Kansas City, Kan., on the brief), for appellees.

Before MURRAH, Chief Judge, and PICKETT and HILL, Circuit Judges.

HILL, Circuit Judge.

This class action was brought below by a group of Negro children, through their parents and next friends, to enjoin the appellee Board of Education from continuing certain alleged discriminatory practices in the administration of the Kansas City, Kansas, school system. The relief sought was granted in part and denied in part. The appeal is from that portion of the decree denying the class relief as sought.

Because of the broad attack made upon the administration of the school system, it is necessary to detail the evidence adduced at the trial below.

The public schools operated by the Board of Education of Kansas City, Kansas, consist of elementary, junior high and high schools as well as a junior college. The entire school system was operated on a segregated basis for many years prior to 1951. The pupils and faculty of each school were all of one race. In 1951 the Board merged the two previously segregated junior colleges into one integrated junior college. The two junior colleges had been located in the same buildings as the segregated high schools and each of them had its own faculty which reflected the racial composition of the student body. The teachers taught in both the high school and the junior college. After the two junior colleges were merged into one junior college in a separate building, the faculty of the one integrated junior college became all white and the Negro teachers were retained but became full-time teachers in the segregated high school.

During the period from 1951 to 1954, the Board operated four high schools, six junior high schools and thirty-eight elementary schools on a segregated basis. Three of the high schools—Rosedale, Argentine and Wyandotte—were white and one high school—Sumner—was Negro. As to the six junior high schools, Rosedale, Argentine, Central, West and Northwest were composed of white students and Northeast was Negro. Seven of the thirty-eight elementary schools were Negro: Douglass, Grant, Stowe, Dunbar, Kealing, Attucks and Lincoln. The remaining thirty-one elementary schools, including Hawthorne, were white. Throughout this period of time, no Negro children attended Hawthorne Elementary School or Northwest Junior

High School and no white children attended Northeast Junior High School. Again, the faculties of all of the schools reflected the racial composition of the respective student bodies.

On August 2, 1954, and subsequent to the decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, the Board initiated a policy whereby the school system was to be integrated "as rapidly as classroom space can be provided" and it empowered the Superintendent of Schools to implement that policy. In his reports to the Board on November 21, 1955, May 7, 1956 and March 3, 1958, the Superintendent recited that integration of the school system was accomplished in four steps. First; the merging and integration of the Junior College at the opening of school on September 10, 1951, prior to the decision in Brown and the resulting declaration of policy. Second; the establishment of tentative boundary lines between formerly Negro and formerly white segregated schools based upon geographic lines, and not race, which resulted in the integration of all kindergarten students, of all first grade students with the exception of those attending two named schools, where studies indicated that housing might not be available, of all 7th grade students in all of the junior high schools and of all 3 grades in all of the high schools. In addition, all of the grades in one elementary school were integrated. Students were permitted to attend the school located in the district in which they were a resident or had previously attended before the change in boundary lines so as to avoid unnecessary and undesirable psychological effects upon them. According to the November 21, 1955, report, this second step resulted in 232 Negro children attending schools which were formerly all white and, of this number, 165 students were in the elementary schools and 67 students were in the junior high and high schools. It also resulted in the attendance of Negro children at 16 of the 30 elementary schools that were formerly all white and in all 5 of the junior high and high schools that were formerly all white. These results were accomplished by the opening of school in September, 1954. Third; by the opening of school in September, 1955, all of the elementary grades were integrated in all of the elementary schools except one, where housing was inadequate, and all of the grades of all of the junior high schools were integrated. The total number of elementary schools having no Negro students dropped from 14 to 11, even though 2 new schools were opened in areas having no Negro residents, and the number of Negro students attending formerly white schools in the elementary and secondary grades increased from 232 to 619. The number of Negro students from kindergarten through Junior College attending formerly white segregated schools increased from 302 in September, 1954, to 703 in September, 1955, and one white student attended the formerly all Negro high school, Sumner. It was noted that, as integration proceeded, further adjustments in the boundary lines of the schools would be almost inevitable because of housing accommodations. Fourth; by the opening of school in September, 1956, the school district boundary lines were defined, all students were required to attend the school of the district in which they resided, unless granted a permit to attend elsewhere, and permits were issued to students who desired to continue attendance at Sumner High School, regardless of where they resided. In addition, the greater part of the bus transportation was discontinued.

The school system operates on what is known as the "neighborhood school policy" and the "feeder school policy". Under the neighborhood school policy, boundary lines for a school attendance district are established as nearly as possible in the area surrounding the school and it takes into consideration such factors as school capacity, number of students, natural barriers, such as rivers and railroad lines, and the possibility of increase or decrease in population. Any student living within the boundaries of

that school district may attend the school as a matter of right and ordinarily is required to do so. The feeder school policy means that all of the students who graduate from a given elementary school must attend the same designated junior high school and all of the students who graduate from a given junior high school must attend the same designated senior high school.

The junior high schools involved in this litigation are West, Northwest and Northeast. They are located on an east-west line in the north part of the city. The Hawthorne Elementary School is directly involved in this litigation. Its boundary lines were established by the Board on August 5, 1957, for the school year of 1957–1958 and were to remain in effect until changed. Prior to 1960, Hawthorne was a predominantly white school and was staffed by white personnel. Under the "feeder" system students graduating from Hawthorne were required to attend Northwest Junior High School and, thereafter, Wyandotte High School, both of which were and are predominantly white schools.

In about 1956, the city commenced two slum clearance projects covering areas in which almost all of the residents were Negroes. Consequently, under the neighborhood school policy most of the elementary schools located in those areas were attended by Negro children and under the feeder school policy most of these students were required to attend Northeast Junior High School upon graduation from elementary school. As a result of the two projects, large numbers of Negro families were forced to move and many of them purchased homes in the attendance district of Hawthorne Elementary School, mainly between 9th and 13th Streets. Thus, by 1960 a majority of those residing in the Hawthorne district were Negroes, with the heaviest concentration being east of 13th Street. In September, 1960, only 4 Negro families lived west of 13th Street but by January, 1962, that number had increased to 50 or 55 families. Accordingly, at the time of trial in 1962, Hawthorne had changed from a so-called white school to a predominantly Negro school and the faculty became all Negro rather than white.

The Superintendent of Schools testified that, as a result of the shift in population caused by the two projects, studies and surveys were made in September, 1959, of the Northwest, Northeast and Hawthorne areas and it appeared that there was a possibility that Northwest Junior High School would become overloaded and overcrowded and half-day sessions might be required in that school. It was also anticipated that there would be vacant classrooms at Northeast Junior High School. The Superintendent further testified that changes were made in the attendance boundary lines for Northwest and Northeast in order "to equalize the student load in the two buildings." The minutes of the Board meeting of August 22, 1960, show that the attendance district of Hawthorne Elementary School was divided and the students graduating from that school who resided east of 13th Street, which includes the appellants, were assigned to Northeast Junior High School. Prior to that time, all students graduating from Hawthorne were, under the feeder system, assigned to Northwest. It is this change in the Hawthorne attendance district, which required the appellant children to attend Northeast rather than Northwest, that gave rise to this litigation.

The record shows that the student seating capacity at Northwest Junior High School in the school year of 1960–1961 was 1,367 and at Northeast it was 1,217. The student enrollment at Northwest during the school year of 1959–1960, prior to the changes in boundary lines, was 1,129 and at Northeast it was 923. After the change in boundary lines and during the school year of 1960–1961, the student enrollment was 1,176 at Northwest and 1,006 at Northeast. Both of these figures are below the student capacity of the respective schools but the Superintendent testified that " * * * educationally, you cannot put in more than about 85 to 87 percent of the total seating capacity in a building and enroll

them, because not all subjects are enrolled in equally, so, when you reach within 13 to 15 percent of the maximum seating capacity of a building, you are destroying the educational opportunities." Had the boundary line not been changed, the enrollment would have been 1,250 at Northwest and 932 at Northeast.

At the same Board meeting in which the boundary line changes were made, the Board adopted a policy of granting permits for students from the Hawthorne District east of 13th Street, who had attended Northwest the previous year, to continue at that school. It also specifically adopted a policy, which had been in effect prior to that time, of granting permits to students enabling them to transfer from a school "where the majority of the students are of a different race", when the students requested such a transfer.

The evidence indicates that the division of the Hawthorne district whereby the students residing east of 13th Street were required to attend Northeast rather than Northwest, was not publicized to any great extent and that the appellants experienced some difficulty in ascertaining the basis for the change. The appellant parents met on different occasions with the Assistant Superintendent of Schools, the Board and the Superintendent. They were ultimately advised of the change in boundary lines and the children were all denied enrollment at Northwest Junior High School for the school years of 1960–1961 and 1961–1962. Testimony was also presented on behalf of appellants to the effect that for the school years of 1960–1961 and 1961–1962 some of the children in the same family were required to attend Northeast while some of them were attending Northwest

and that the distance from their homes to Northeast was appreciably greater than the distance to Northwest.

It should be pointed out, however, that the appellees presented evidence to the effect that under the Board's rules the maximum distance a student could live from a school and still attend that school was about 1.5 miles and this is the generally accepted maximum distance. Evidence was also presented to the effect that while school boundary lines, prior to 1954, were drawn on the basis of race, such lines were thereafter established upon the basis of geography, i. e., school capacity and number of children living within a prescribed area surrounding a school, and that the change in boundary line on August 22, 1960, was made without knowledge of the number of white and Negro students to be affected and without race in mind.

The record discloses that, as of the time of trial below, the student bodies of Attucks, Douglass, Dunbar, Grant, Kealing and Stowe Elementary Schools were all, or predominantly, Negro children and that while Lincoln Elementary School had been discontinued, Hawthorne Elementary School had become a predominantly Negro school. Northeast Junior High School and Sumner High School were, at that time, virtually 100 percent Negro and all of these schools were staffed by Negro personnel. The record also discloses that, as of April 13, 1962, the racial composition of the student bodies at the Junior College and the remaining junior and senior high schools was as set forth in the margin.[1] As of the same date, only 11 of the elementary schools had an all white student body and out of a total enrollment of 7,257 in the remaining 20 elementary schools,

1.

| School | White | Negro |
|---|---|---|
| Junior College | 465 | 94 |
| Argentine | 997 | 124 |
| Rosedale | 912 | 134 |
| Wyandotte | 1749 | 117 |
| Central Junior High | 990 | 67 |
| Northwest Junior High | 878 | 239 |
| West Junior High | 601 | 21 |

there were 1,360 Negro children in attendance.

The trial court resolved the controversy over the pupil transfer policy in favor of the plaintiffs-appellants and held it to be unconstitutional. No appeal was taken from that part of the decree. But, with that exception, the lower court approved the overall policy of the Board and, in denying the injunction, found and held that: In relocating the boundary in the Hawthorne district for the purpose of establishing the boundaries of the Northwest and Northeast Junior High Schools, the Board "acted in good faith and for the purpose of balancing the enrollment of the two schools involved"; relocation of attendance district boundaries for the Kansas City public schools was made "on the basis of building location and after population studies indicated the predictable pupil loads which the various buildings could accommodate"; each child would attend the school within the district of his residence, without regard to race; and the overall policy of the Board met "the tests set forth in Brown v. Board of Education, 349 U.S. 294 [75 S.Ct. 753, 99 L.Ed. 1083], and, with the exception of the transfer policy herein referred to, has served to effectuate a racially non-discriminatory school system." It is from this portion of the decree that this appeal was taken.

Appellants contend here, as they did in the court below, that the Board's policy evinces a clear pattern of the deliberate use of zone lines and assignment regulations to insure the continued operation of a segregated school system. To support this contention, they point out the following factors: The fact that seven of the elementary schools are still composed of predominantly Negro students and eleven are composed of all white students; the Northeast Junior High and the Sumner High schools are still virtually 100 percent Negro; the boundary lines for Northwest and Northeast Junior High Schools were so changed in the Hawthorne district as to require the majority of the Negro children residing in that district to attend the Negro schools of Northeast and, thereafter, Sumner; the fact that Negro schools are staffed by Negro personnel and white schools with only white personnel; and the transfer system whereby children were permitted to transfer out of their normal school district when the majority of the students in that school were of a different race. The appellants also attempted to demonstrate by use of the 1962 census figures that a great majority of Negro students still attend Negro schools but that is not helpful because those figures are confined to the number of children residing in the City of Kansas City and the boundary lines for the Board of Education are not identical with the city boundary lines.

The starting point in any school segregation case is the basic principle that state-imposed racial segregation in the public schools is unconstitutional and prohibited by the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632; Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; Brown v. Board of Education, supra. The right of a student not to be discriminated against or segregated on racial grounds in the public schools is so fundamental that it is embraced in the concept of due process of law under the Fifth Amendment. Cooper v. Aaron, supra; Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884. This principle is the supreme law of the land, Cooper v. Aaron, supra, and all provisions of federal, state and local law requiring or permitting such segregation or discrimination must yield to it, Brown v. Board of Education, supra, 349 U.S. at 298, 75 S.Ct. 753. The burden of intiating desegregation in the public schools rests upon the school authorities, who have the primary responsibility for assessing and solving the varied local school problems arising as a result of implementing the decision in Brown, supra, and the courts must determine whether the action of the school authorities constitutes good

faith implementation of those constitutional rights. Cooper v. Aaron, supra; Brown v. Board of Education, supra, 349 U.S. at 299, 75 S.Ct. 753. There cannot be full compliance with these constitutional requirements until all dual school systems based upon race or color have been eliminated. Ross v. Dyer, 5 Cir., 312 F.2d 191; Augustus v. Board of Public Instruction, 5 Cir., 306 F.2d 862.

The Supreme Court in Cooper v. Aaron, supra, held that the Fourteenth Amendment prohibitions against racial discrimination in the public schools " * * * extend to all action of the State denying equal protection of the laws; whatever the agency of the State taking the action * * * or whatever the guise in which it is taken * * * " and that the constitutional right of a student not to be discriminated against in the public schools on grounds of race or color " * * * can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously' * * * *." (358 U.S. at 17, 78 S.Ct. at 1409) Thus, it has been held that a transfer plan or policy, such as the one adopted by the Board in this case, whereby a student might transfer out of a desegregated school if a majority of the students in that school are of a different race than the student seeking such transfer, is invalid. Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632; Mapp v. Board of Education of City of Chattanooga, 6 Cir., 319 F.2d 571; Brooks v. County School Board of Arlington County, Virginia, 4 Cir., 324 F.2d 303. The application of such criteria as overcrowding in the school rooms to one race and not to another so as to bar the assignment of certain students to a particular school is prohibited, Marsh v. County School Board of Roanoke County, Virginia, 4 Cir., 305 F.2d 94, as is the intentional gerrymandering of school attendance district lines

so as to confine one race to attendance at a particular school, Taylor v. Board of Education of City School District of New Rochelle, 2 Cir., 294 F.2d 36, cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339. Finally, the maintenance of a discriminatory "feeder" system, whereby pupils assigned initially to a Negro school were routinely promoted to Negro schools and, in order to transfer to white schools, they were required to meet criteria to which white students of the same scholastic aptitude would not be subjected, does not comport with constitutional principles. Bradley v. School Board of City of Richmond, Virginia, 4 Cir., 317 F.2d 429.

The neighborhood school system and other school systems, by which admission to the school is determined upon the basis of similar criteria such as residence and aptitude, are in use in many parts of the country. They have been successfully challenged on constitutional grounds where operated in such a way as to discriminate against students because of their race or color. E.G. Norwood v. Tucker, 8 Cir., 287 F.2d 798; Northcross v. Board of Education of City of Memphis, 6 Cir., 302 F.2d 818, cert. denied, 370 U.S. 944, 82 S.Ct. 1586, 8 L.Ed. 2d 810; Green v. School Board of City of Roanoke, Virginia, 4 Cir., 304 F.2d 118; Dodson v. School Board of City of Charlottesville, 4 Cir., 289 F.2d 439; Jones v. School Board of City of Alexandria, Virginia, 4 Cir., 278 F.2d 72. On the other hand, these same cases recognize the principle that in the absence of a showing that such school systems are being used to deprive a student of his constitutional rights, they are not objectionable on constitutional grounds.[2] In the second Brown case, supra, the Supreme Court appears to have recognized that school admissions may be based upon such factors as residence. It said that in determining "good faith compliance at the earliest practicable date", the lower courts might take into account problems arising from the " * * * re-

2. See also Shuttlesworth v. Birmingham Board of Education, 162 F.Supp. 372 (N.D.Ala.1958), aff'd, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145.

vision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis * *." (349 U.S. at 300 and 301, 75 S.Ct. at 756) The Sixth Circuit has said: "Minimal requirements for nonracial schools are geographic zoning, according to the capacity and facilities of the buildings and admission to a school according to residence as a matter of right. * * * " Northcross v. Board of Education of City of Memphis, supra, 302 F.2d at 823.

There is, to be sure, a racial imbalance in the public schools of Kansas City. The record shows that, as of April 13, 1962, there was a total of 7,467 Negro children in the elementary, junior high and senior high schools. Almost 73 percent of these children, or 5,405, attended the nine schools which were predominantly Negro. The remaining 27 percent, or 2,062 children, attended 26 integrated schools. Of course, the schools located the nearest to the concentration of Negro population had the highest percentage of Negro pupils and the schools the greatest distance away from that concentration were composed entirely of white students. Thus, while there were some schools having an all Negro student body and some having an all white student body, there were also 26 of the Kansas City schools that had both Negro and white students. Appellants' assertion that the racial composition of Wyandotte High School and Northwest Junior High School "is consistent with their pre-1954 character" has no support in the evidence, which shows that these schools were all white prior to 1954 and, after 1954, there were 117 Negro students in attendance at Wyandotte and 239 at Northwest. The evidence clearly shows that at least some Negro students were in attendance at each and every one of the junior high and senior high schools in the Kansas City school system. And, the Superintendent of Schools testified that the school attendance districts were laid out without regard to race and upon the basis of geography, school capacity and number of children residing in the

district. There is therefore no basis in fact for the appellants' contention that the evidence establishes "a clear pattern of deliberate use of zone lines and assignment regulations to insure the continued operation of a dual school system." All of the evidence is to the contrary and the trial court so found saying that the boundary lines after 1954 "were set on the basis of building location and after population studies indicated the predictable pupil loads which the various buildings could accommodate."

It is true that the boundary line in the Hawthorne Elementary School district was changed so as to require the attendance at Northeast Junior High School of all students residing east of 13th Street and that the effect of such change was to require many Negro children, including appellants, to attend the predominantly Negro junior high school, Northeast, rather than Northwest, an integrated school. Of course, we agree with the appellants that the school authorities cannot, under applicable constitutional standards heretofore discussed, use such a change in boundary lines or the neighborhood school system as a guise for the purpose of perpetuating racial segregation. The trouble is that there is no evidence to show that the boundary line was changed for that purpose. Rather, the trial court, after hearing and observing the witnesses, found that the school authorities "acted in good faith and for the purpose of balancing the enrollment of the two schools involved." That finding is supported by the evidence which shows that, as a result of slum clearance projects, there was a general shift in the city's population in a westerly direction. This brought about the relocation of many Negro families to the Hawthorne area. The Superintendent of Schools testified that the change in boundary line was directly attributable to this shift in population and was made without knowledge of the number of white and Negro children to be affected and without race in mind. He also testified that it was made to alleviate overcrowded conditions at

Northwest, which was in danger of having to go on half-day sessions. In addition, the record discloses that in 1956 Parker Elementary School district was divided so as to change some students to West Junior High School from Northwest and as the trial court said: "* * * There is no more reason to believe that the division of Hawthorne district in 1960 was based on any other considerations than those which prompted the division of Parker district in 1956, i. e., to achieve an adjustment of the pupil load between junior high school districts. * * * *" The drawing of school zone lines is a discretionary function of a school board and will be reviewed only to determine whether the school board acted arbitrarily. Northcross v. Board of Education of City of Memphis, 6 Cir., 333 F.2d 661. There is no showing that the Board acted arbitrarily in this case.

It is also true that the staffs of the various schools are either all white, as is the case in white and integrated schools, or all Negro. But, the appellants do not, by their complaint or evidence, seek to have these staffs desegregated. Furthermore, they have not cited and we have not found any case holding that such a policy, in and of itself, is sufficient to establish a discriminatory intent on the part of the Board.

The pupil transfer policy adopted by the Board was held by the lower court to be violative of the Fourteenth Amendment and therefore invalid under the rule announced in Goss v. Board of Education, supra. While no appeal from this ruling was taken, the existence of that policy is relied upon by appellants as indicative of the overall intent of the Board. But, it must be remembered that during the entire period it was in effect, identical systems had been held to be legal and proper when applied equally to Negro and white students, as is the situation in this case. Goss v. Board of Education of City of Knoxville, 6 Cir., 301 F.2d 164, reversed 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632; Kelley v. Board of Education of City of Nashville, 6 Cir., 270 F.2d 209, cert. denied, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed. 2d 240; Dodson v. School Board of City of Charlottesville, 4 Cir., 289 F.2d 439. The use of such a policy therefore has no bearing upon the Board's intent.

It follows from what has been said that none of the factors relied upon by appellants, when considered alone, is sufficient to establish a denial of their constitutional right not to be discriminated against because of race or color. The crucial question, however, is whether all of these factors considered together are sufficient. In this connection the trial court made a negative finding to the effect that there was no evidence to show that the appellees were not carrying out the integration policy set forth in the Superintendent's reports of November 21, 1955, May 7, 1956, and March 3, 1958. The court also found and held that "* * * * the overall policy of the Board of Education of Kansas City, Kansas meets the tests set forth in Brown v. Board of Education, 349 U.S. 294 [75 S. Ct. 753, 99 L.Ed. 1083], and, with the exception of the transfer policy herein referred to, has served to effectuate a racially non-discriminatory school system." The question is one of fact and, dealing as it does with the good faith intentions of the school authorities, it is peculiarly in the province of the trial judge who had the opportunity to hear and observe the witnesses. Under these circumstances, we should be, and are, most reluctant to overturn his findings and conclusions unless convinced that they are clearly erroneous. We are not so convinced on this record. Certainly, there is no evidence of intentional gerrymandering of the school attendance districts, of the use of a dual school system, of the assignment of pupils according to racial factors or of any of the other "schemes" and "devices" condemned in the cases discussed above. In our opinion, the Kansas City school system meets the "minimal requirements for nonracial schools" of "geographic zoning, according to the capacity and facilities of the buildings and admission to a school according to residence as a matter of right."

■ Appellants also contend that even though the Board may not be pursuing a policy of intentional segregation, there is still segregation in fact in the school system and under the principles of Brown v. Board of Education, supra, the Board has a positive and affirmative duty to eliminate segregation in fact as well as segregation by intention. While there seems to be authority to support that contention,[3] the better rule is that although the Fourteenth Amendment prohibits segregation, it does not command integration of the races in the public schools and Negro children have no constitutional right to have white children attend school with them. Kelley v. Board of Education of City of Nashville, supra; Stell v. Savannah-Chatham County Board of Education, 5 Cir., 333 F.2d 55; Evers v. Jackson Municipal Separate School District, 5 Cir., 328 F.2d 408; Boson v. Rippy, 5 Cir., 285 F.2d 43; Holland v. Board of Public Instruction, 5 Cir., 258 F.2d 730; Avery v. Wichita Falls Independent School District, 5 Cir., 241 F.2d 230, cert. denied, 353 U.S. 938, 77 S.Ct. 816, 1 L.Ed.2d 761; Bradley v. School Board of City of Richmond, Virginia, 4 Cir., 317 F.2d 429; Jeffers v. Whitley, 4 Cir., 309 F.2d 621.[4]

Moreover, the question was conclusively answered in Bell v. School City of Gary, Indiana, 7 Cir., 324 F.2d 209, 213, cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216, where the court held that " * * * 'there is no affirmative U. S. Constitutional duty to change innocently arrived at school attendance districts by the mere fact that shifts in

population either increase or decrease the percentage of either Negro or white pupils.' "

■ We conclude that the decisions in Brown and the many cases following it do not require a school board to destroy or abandon a school system developed on the neighborhood school plan, even though it results in a racial imbalance in the schools, where, as here, that school system has been honestly and conscientiously constructed with no intention or purpose to maintain or perpetuate segregation.

The judgment is affirmed.

---

3. [ See Evans v. Ennis, 3 Cir., 281 F.2d 385, 389, cert. denied, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365; Taylor v. Board of Education of City School District, D.C., 191 F.Supp. 181 and 195 F.Supp. 231, aff'd, 2 Cir., 294 F.2d 36, cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed. 2d 339; Blocker v. Board of Education of Manhasset, New York, 226 F.Supp. 208 (E.D.N.Y.1964); Branche v. Board of Education of Town of Hempstead, 204 F.Supp. 150 (E.D.N.Y.1962); Jackson v. Pasadena City School District,

59 Cal.2d 876, 31 Cal.Rptr. 606, 382 P.2d 878.

4. In Brown v. Board of Education, 139 F.Supp. 468, 470 (D.Kan.1955) the three-judge court, after remand from the Supreme Court, said:
" * * * Desegregation does not mean that there must be intermingling of the races in all school districts. It means only that they may not be prevented from intermingling or going to school together because of race or color."