Janice ROGERS, a Minor, Age 16, Patricia Rogers, a Minor, Age 15, by Their Mother and Next Friend, Mrs. Corine Rogers, Appellants,

v.

Dr. Edgar F. PAUL, Dr. Roger Bost, John M. Yantis, Bruce Shaw, Jack Grober, Douglas G. Rogers, Board of Directors of Special School District of Fort Smith, Arkansas; Chris Corbin, Superintendent of Schools of Special School District of Fort Smith, Arkansas; Special School District of Fort Smith, Arkansas, a Corporation, Appellees.

No. 17870.

United States Court of Appeals
Eighth Circuit.

May 7, 1965.

Derrick A. Bell, Jr., New York City, made argument for appellants and filed brief with Jack Greenberg and John W. Walker, New York City, and George Howard, Jr., Pine Bluff, Ark.

Bruce H. Shaw, of Shaw, Jones & Shaw, Fort Smith, Ark., made argument for appellees and filed brief with John S. Daily, of Daily & Woods, Fort Smith, Ark.

Before VOGEL, MATTHES and MEHAFFY, Circuit Judges.

MATTHES, Circuit Judge.

In Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632, decided June 3, 1963, the Supreme Court held unconstitutional so-called voluntary transfer provisions incorporated in the formal desegregation plans adopted by the school boards of the Knoxville, Tennessee and the Davidson County, Tennessee School Districts. In the desegregation plan adopted by the school board of the Special School District of Fort Smith, Arkansas, a voluntary transfer provision was incorporated under which any student, upon request, was permitted, solely on the basis of his own race and the racial composition of the school to which he was assigned by virtue of the attendance area in which he resided, to transfer from such school, where he would be in racial minority to the school in which his race or color predominated.

Approximately three months after Goss was decided, Mrs. Corine Rogers, a Negro parent, filed this suit in behalf of her two minor daughters, Janice, then 16, and Patricia, then 15, and in behalf of all other Negro minors within the Special School District of Fort Smith, Arkansas, who are similarly situated because of race and color. She sought to enjoin the school board members and the District Superintendent, defendants in the action, from maintaining and operating segregated public schools in such district. Janice graduated from the twelfth grade upon completion of the 1963–1964 school term, and as to her the issues presented by this litigation are now moot. Patricia will enter the last year of high school with the advent of the 1965–1966 school year.

The allegations of the complaint upon which plaintiffs (hereinafter designated as appellants) premise their right to relief appear verbatim in the District Court's opinion (Judge John E. Miller), 232 F.Supp. 833 (1964) and need not be fully restated herein. It is sufficient to recall that appellants alleged that defendants (hereinafter sometimes designated as appellees) were maintaining and operating segregated high schools for the minor appellants and the members of the class they represent; were maintaining and operating the voluntary transfer system for assignment of pupils; were maintaining and approving budgets, programs and curricula designed to perpetuate and maintain compulsory racially

segregated schools; and were assigning principals, teachers, and administrative personnel to the various high schools on the basis of their race and color, all in violation of the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution.

At a pretrial conference held after the issues had been joined, the Court ruled that the voluntary transfer provision was invalid and granted appellees a reasonable time to file a revised plan of integration. On July 17, 1964, appellees, in compliance with the Court's order, filed a revised plan which also came under attack by appellants.

After a trial on August 10, 1964, the Court, on August 19, 1964 filed its opinion, and entered judgment approving and confirming the revised plan of integration. The Court, however, retained jurisdiction of the cause for a decision "of any question that might arise as to the assignment of teachers and principals."

We revert now to the original desegregation plan, the circumstances attending its adoption, its effect upon segregation, and to other pertinent facts and circumstances.

Following Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the Board of the Special School District of Fort Smith, pursuant to voluntary action on its part, announced a policy on integration of the Fort Smith public schools. The policy was enunciated in a plan which was formulated and adopted by the Board in 1956. The plan became effective at the beginning of the 1957–1958 school year, provided for the desegregation of one grade each year commencing with the first grade and progressing through the twelfth grade, and as noted, had incorporated therein the voluntary transfer provision.

There are now 30 schools in the District. In the 1963–1964 school year the total school population was slightly in excess of 14,000. The average daily attendance of Negro pupils was 1,082, and

the average daily attendance of white pupils was 11,423. In that same school year 39 Negro pupils were enrolled in and attended predominantly white schools. It appears that pupils of both races took advantage of the voluntary transfer provision. Thus, by way of illustration, in the 1963–1964 year 323 white pupils and 214 Negro pupils transferred from schools located in their residential areas, which they were at liberty to attend, to other schools where their race predominated. The Superintendent testified without contradiction, that if the voluntary transfer provision had not been utilized there would have been 150 to 170 Negro pupils attending predominantly white elementary schools in the 1963–1964 year, and approximately 100 white students would have attended predominantly Negro schools in the same school year. The facts in regard to the transfer issue caused Judge Miller to observe "It seems clear that the great majority of pupils, white and Negro, do not desire to attend an integrated school." 232 F. Supp. at p. 838.

The revised plan readopted what may appropriately be referred to as the geographic school zoning system. The voluntary transfer provision was eliminated. Under the plan "all pupils will be assigned to the elementary school district in which they reside, without regard to race." However, there was excepted from the plan's operation for a period of one year the following three elementary school attendance areas having a predominantly Negro population: Howard Elementary School, having a ratio of approximately 55 white pupils to 530 Negro pupils; Dunbar Elementary School, having a ratio of approximately 22 white pupils to 60 Negro pupils; and Washington Elementary School, having a ratio of approximately 30 white pupils to 70 Negro pupils. The exception was made to permit pupils residing in the three named attendance areas to resort to the voluntary transfer provision for the stated period of one year.[1]

1. In justification of the exception, the Board stated that there "would be an in-

tense psychological impact in the assigning of a minority of White pupils to pre-

The revised plan provides that integration was to continue on the basis of a grade each year until complete integration through the twelfth grade has been accomplished. Thus, under the plan the eighth grade was integrated during the 1964–1965 school year and four additional years will be required to fully integrate all grades.

Provisions in the revised plan, not found in the original one, are designed to effect reorganization and establish the 6–3–3 system so as to provide a basic six-year elementary school program, a three-year junior high school program, and a three-year senior high school program commencing in September 1965.[2]

The plan also contemplates a reorganization of the secondary schools in a manner that will better serve the community and meet the educational needs of the pupils. It is expressly provided that "Any transfer either voluntary or involuntary of a pupil from one secondary school district to another must be done hereafter for reasons that appear adequate to the administration, which reasons are neither based upon nor influenced by race or color."

The foregoing background facts bring us to the issues presented in this appeal. We will advert to other pertinent facts during our consideration and discussion of the contentions of the parties.

Summarily stated, appellants contend that the District Court erred in approving the revised plan for the reasons: (1) it unreasonably delays total desegregation for four years; (2) it unreasonably subjects the minor appellants and other Negroes similarly situated to an inferior as well as segregated education and prevents Patricia Rogers from attending the predominantly white Northside High School; (3) it deprives the minor appellants and other Negroes similarly situated of their constitutional right to instruction by teachers assigned without regard to race. The fourth and final contention brings into issue the refusal of the trial court to allow reasonable attorney's fees to appellants for the prosecution of this litigation.

We pause to observe that appellants do not attack or challenge the validity of the geographic school zoning system embraced by the revised plan. Neither is there any hint or suggestion of intentional gerrymandering of the school zones so as to confine one race to attendance at a particular school as was the situation in Taylor v. Board of Education of City School District of New Rochelle, 294 F.2d 36 (2 Cir. 1961), cert. denied 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961). Thus, we have here a case where the primary and basic complaint is that the school board has moved too deliberately and with insufficient speed in bringing about desegregation of all of the grades in the Fort Smith system. What appellants are obviously desirous of ac-

---

viously all Negro elementary schools. * * * The Board feels that its good faith in formulating this Revised Plan cannot be challenged because of this element of delay in connection with these three schools when consideration is given to the fact that this revised plan will result in the immediate integration of more than 106 Negro pupils into the predominantly White elementary schools upon the Court's approval of this Revised Plan.

"(b) Because of the state of repair and the generally poor physical condition and inadequacy of facilities at Washington Elementary School, this school will be discontinued by the beginning of the 1965–66 school year. At that time and beginning with the 1965–66 school year, the Negro pupils within the present attendance area of Washington Elementary School will be assigned to the Sutton Elementary School and the Spradling Elementary School.

"(c) Beginning with the school year 1965–66 the Howard Elementary School and the Dunbar Elementary School will continue upon a fully integrated basis."

We assume that the one year moratorium applicable to the three named elementary schools will end with the termination of the 1964–1965 school year, and that grades one through nine will be integrated during the 1965–1966 school year.

2. The plan designates the schools in which the reorganization will be accomplished. We deem it unnecessary to burden this opinion with an analysis of the plan in this regard.

complishing by this litigation is desegregation of grades nine through twelve by the beginning of the 1965–1966 school term.

Before turning to an evaluation of the original desegregation plan, its revision, and the Board's actions relating thereto, we deem it appropriate to again briefly review the pertinent criteria to be considered in resolving the issues presented.

In the second Brown case, the Supreme Court stated:

" \* \* \* [T]he courts will require that the defendants [Board] make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system \* \* \*." 349 U.S. at pp. 300–301, 75 S.Ct. at p. 756.

Since Brown the time available for making the transition from a segregated to a desegregated school system has decreased and the emphasis on local problems has been reduced. See Watson v. City of Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963); Goss v. Board of Education, 373 U.S. 683, 83 S. Ct. 1405 (1963); Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Calhoun v. Latimer, 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288 (1964). In Goss, supra, 373 U.S. at p. 689, 83 S.Ct. at p. 1409, the Court enunciated the context in which desegregation plans must be judged:

" \* \* \* Indeed, it was consideration for the multifarious local difficulties and 'variety of obstacles' which might arise in this transition that led this Court eight years ago to frame its mandate in Brown in such language as 'good faith compliance at the earliest practicable date' and 'all deliberate speed.' Brown v. Board of Education, 349 U.S., at 300, 301, 75 S.Ct. at 756 [753]. Now, however, eight years after this decree was rendered and over nine years after the first Brown decision, the context in which we must interpret and apply this language to plans for desegregation has been significantly altered."

*Delay issue.*

Although appellants do not expressly or impliedly assert that the revised plan is the product of or motivated by *actual* bad faith on the part of the Board members and Superintendent, they do assert, in effect, that the failure of the plan to provide for complete desegregation without further delay constitutes lack of good faith as a matter of law within the teachings of the Supreme Court in the Brown cases, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, and the subsequent cases in which the Supreme Court expounded the Brown mandate. Thus, they argue that "there is no reason to prolong for another four years a procedure which practically and constitutionally can be accomplished in one."

Similar assertions made below were treated by Judge Miller in this language: "[w]hen the actions of the School Board from 1956 to the present time are considered, along with the many decisions of

the Supreme Court and the appellate courts, it is difficult for this writer [Court] to understand why such contentions would be made. There have been and is now an exceptionally harmonious and cooperative relationship between the races in Fort Smith, Arkansas. Integration is an accomplished fact,[3] and certainly the School District, acting through its Directors, made 'a prompt and reasonable start towards compliance with the Brown decision.'" 232 F.Supp. at p. 840.

This determination is factually sound and was not induced by an erroneous concept of the controlling legal principles. The integration plan adopted by the school board without compulsion, when evaluated in light of local conditions and administrative hurdles, convinces us that not only did the school board make a "prompt and reasonable start toward full compliance," but that desegregation has in fact moved forward with "all deliberate speed."

But appellants argue further that there was no showing of valid administrative problems justifying prolonging of complete desegregation for four additional years. We do not so read the record. Both appellants and appellees were satisfied to rely mainly on the testimony of the Superintendent of Schools of the Special School District of Fort Smith.[4] His testimony in substance was that since the voluntary adoption of the desegregation plan in 1956, the Board has continuously been confronted with administrative problems arising out of: (a) school population growth and inadequacy of buildings and other facilities; (b) mass shifting within the District of School population from the older sections of Fort Smith to new suburban areas; (c) the huge building program entailing an expenditure of approximately $10,000,-000; and (d) the transition of all of the schools into a regular 6–3–3 system. The Superintendent further stated that to require immediate desegregation of the four remaining grades would give rise to additional administrative problems and would greatly hamper what has to date been an orderly desegregation of the schools. That the Superintendent was qualified to express the foregoing opinion can hardly be gainsaid. He had been in the Fort Smith school system for 24 years as a principal, 4 years as assistant superintendent, and 10 years as Superintendent. His uncontradicted testimony supports the conclusion that to compel immediate and complete integration would needlessly thwart the good faith efforts of the Board to accomplish de jure desegregation in a peaceful and orderly manner.

In further support of their contention that the Board has not gone forward with all deliberate speed, appellants make reference to recent Third, Fourth, Fifth and Sixth Circuit decisions which require school boards to desegregate all grades within no more than four to six years in lieu of the twelve year grade-a-year plans. A cursory examination of these authorities reveals one unavoidable and most significant factual dissimilarity with the facts presented in this appeal. Among other important factual variances, every case involved situations where the school boards had either failed to act in good faith or after inordinate delays had proposed a plan which was too slow and unduly protracted the process of desegregation. The courts were there confronted with proposed desegregation plans of the grade-a-year variety which were to commence from 5 to 10 years after the Supreme Court's first disposi-

---

3. Appellants acknowledge in their brief that "[a] private Junior college and the Catholic schools are integrated as are the local hotels, movie theatres, skating rinks, bowling alleys and the swimming pool."

4. We note that appellants' case consisted of the Superintendent of Schools of the Special School District, the Principal of Lincoln High School and two of the appellants, Mrs. Corine Rogers and Patricia Rogers. Only the Superintendent of Schools testified on behalf of appellees.

tion of the Brown case in 1954. In Evans v. Ennis, 281 F.2d 385 (3 Cir. 1960), in the Fall of 1959 (5 years after Brown); Jackson v. School Board of City of Lynchburg, Virginia, 321 F.2d 230 (4 Cir. 1963), in the Fall of 1962 (8 years after Brown); Bush v. Orleans Parish School Board, 308 F.2d 491 (5 Cir. 1962), the revised plan in the Fall of 1962 (8 years after Brown); Gaines v. Dougherty County Board of Education, 334 F.2d 983 (5 Cir. 1964), in the Fall of 1964 (10 years after Brown); Stell v. Savannah-Chatham County Board of Education, 333 F.2d 55 (5 Cir. 1964), cert. denied, Roberts v. Stell, 379 U.S. 933, 85 S.Ct. 332, 13 L.Ed.2d 344 (1965); Armstrong v. Board of Education of Birmingham, 333 F.2d 47 (5 Cir. 1964), in the Fall of 1963 (9 years after Brown); Goss v. Board of Education of the City of Knoxville, 301 F.2d 164 (6 Cir. 1962), reversed on other grounds, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), in the Fall of 1960 (6 years after Brown); Lockett v. Board of Education of Muscogee County, 342 F.2d 225 (5 Cir. 1965), and Bivins v. Board of Public Education and Orphanage, 342 F.2d 229 (5 Cir. 1965), in the Fall of 1964 (10 years after Brown.)

Desegregation of the Fort Smith public schools stands out in bold contrast to desegregation efforts in some biracial districts where there was hard core opposition to any semblance of integration. See e. g. Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) for history of desegregation efforts in Prince Edward County, Virginia. In Fort Smith the transition was smooth and without incident. There was no manifestation of bad feeling or violent opposition. The lack of any evidence to indicate any serious objection to the plan of desegregation is impressive. So far as this record is concerned, both races are satisfied with the revised plan. It has been accepted by the majority of

pupils and parents as the best method of complying in good faith with the law. To be sure, the original plan contained the voluntary transfer provision which was struck down by the Supreme Court as violative of the constitutional rights of the Negro children. But this defect was eliminated without unreasonable delay, and full integration is now assured. Nearly one-third or approximately 300 of eligible Negro children attended schools having a predominantly white population in the current, 1964–1965 school year, and obviously the number will increase each of the four remaining years as integration moves forward. We are convinced, as was the able, understanding and discerning trial judge, that the administration of the plan has been eminently successful and satisfactory, and that the members of the Board and other school authorities should not be deprived of the right to exercise their sound discretion in discharging their primary responsibility for "assessing and solving the problems that confront them." Brown, supra.

*Subjugation to inferior and segregated education issue.*

In support of their efforts to bring about full and immediate desegregation, appellants contend that Patricia Rogers [5] and other Negro high school students similarly situated are subjected to an inferior as well as segregated education. More specifically, we are requested to direct the entry of an order permitting Patricia to transfer from Lincoln High School to Northside High School for the 1965–1966 school year in order that she may avail herself of an integrated education and be permitted to obtain instruction in journalism, music, and German, which are unavailable at Lincoln. In regard to the alleged inferior education available to Negro students, the Superintendent testified without contradiction that the Lincoln High School

---

5. As we have seen, Janice Rogers graduated from Lincoln High School in 1964. The record shows that she is presently attending the Fort Smith Junior College which is completely desegregated.

facilities have been regularly improved;[6] and there exists an equal apportionment of teachers per pupil throughout the three high schools;[7] that the per pupil operating cost for Lincoln was greater than the largest white high school;[8] and that "Lincoln High School has been accredited by the North Central Association since 1924, before that it was accredited by the Southern Association, and it meets fully the requirements of the students under requirements of the North Central Association for full accreditation." Additionally, the Superintendent stated:

"* * * you try to step up a curriculum based on the size and what the pupils request in the school. We have told all of our high schools, all three of them, that we would offer *any* course requested if there are as many as six students that want the course and we can find a teacher to teach it. Lincoln High School and Northside High School have been North Central accredited High Schools, the same length of time, I believe since 1924. The Southside High School is not accredited by the North Central Association at the present time. Therefore the offerings in each school are based on what the students want in the school."

This record provides no basis or warrant for an order directing the Board to transfer Patricia Rogers from Lincoln to Northside High School for the 1965–1966 school year. True, in Jeffers v. Whitley, 309 F.2d 621, 629 (4 Cir. 1962) and Board of Education of St. Mary's

County v. Groves, 261 F.2d 527, 529 (4 Cir. 1958) immediate relief was granted to individual plaintiffs; however, unlike here, in those districts the geographic school zoning system had not been adopted. We observe that in Jeffers, supra, at fn. 11, p. 627 of 309 F.2d, the Court recognized the basic and necessary distinction between a "voluntary application for assignment system" and a "geographic school zoning assignment system," stating, "In other systems of assignment, as those based upon geographic school zoning, the wish of the individual may be, and usually is, immaterial. It is the essence of a voluntary system of racial separation." As we have indicated, appellants have no quarrel with the geographic school zoning system embraced in the Fort Smith plan of desegregation. Patricia Rogers resides within three blocks of Lincoln High School and within Lincoln's geographical attendance area. Under the plan she is required to attend Lincoln High School. To allow her to transfer would constitute discriminatory action in her favor, would open the door to similar requests, and would weaken the stability of the entire geographic attendance area system. Compare Downs v. Board of Education of Kansas City, 336 F.2d 988 (10 Cir. 1964), cert. denied 85 S.Ct. 898, where the Court very pertinently stated:

"While there seems to be authority to support that contention,[9] the better rule is that although the Fourteenth Amendment prohibits segregation, it does not command integration of the races in the public schools

---

6. In reviewing the improvements of the Negro schools he stated: "At Lincoln High School, dropping back to the beginning of our building program, back about the 1948 to 1950 era, we built a new shop building there and did considerable renovation on the old building, and then about two years ago we built a new gymnasium and a new classroom wing, so there has been considerable improvement."

7. The predominantly white Northside and Southside High Schools have approximately 85 teachers for 2300 students and 40 teachers for 1000 students, respective-

ly; Lincoln High School has 21 teachers for less than 500 students.

8. During the 1962–1963 school year the per pupil operating cost at Northside was $269.00 per pupil; at Lincoln it was $288.00 per pupil.

9. In Downs, appellants contended that even though the Board was not pursuing a policy of intentional segregation, there was still segregation in fact and that the Board was required to eliminate segregation in fact as well as segregation by intention.

and Negro children have no constitutional right to have white children attend school with them. (citing cases).

\* \* \* \* \* \*

" ' \* \* \* "there is no affirmative U.S. Constitutional duty to change innocently arrived at school attendance districts by the mere fact that shifts in population either increase or decrease the percentage of either Negro or white pupils." ' " 336 F.2d at p. 998.

*Teacher issue.*

■ Desegregation of teachers is recognized as a part of the over-all desegregating process, and courts have been ordering districts to undertake teacher integration as a part of the total job of desegregating the schools. Pupils in grades that are integrated have standing to challenge faculty segregation, not necessarily for the purpose of protecting the constitutional rights of the teachers, but in order to insure that the pupils will not be discriminated against on the basis of their race. Hence, under proper circumstances pupils are within their rights in insisting that a teacher not be selected on the basis that the teacher's race corresponds to their own. See and compare Augustus v. Board of Public Instruction, 306 F.2d 862 (5 Cir. 1962); Mapp v. Board of Education of Chattanooga, 319 F.2d 571 (6 Cir. 1963); Northcross v. Board of Education of City of Memphis, 333 F.2d 661 (6 Cir. 1964); Board of Public Instruction of Duval County, Fla. v. Braxton, 326 F.2d 616 (5 Cir. 1964).

■ Judge Miller refused to strike the allegation in the complaint which raised the assignment of teachers issue, holding that "[I]t might become material and require consideration if the question is raised by proper parties, \* \* \* [and] in order to avoid a multiplicity of suits, the court will retain jurisdiction of the case in order that the question may be raised if any proper party desires to intervene." Appellants seem to regard the foregoing to mean that only a teacher has standing to challenge discrimination in teacher assignments. We do not so regard the holding and are not persuaded that Judge Miller so intended. The Court was familiar with the cases cited, supra, which stand for the proposition that pupils may have standing to litigate the issue. Seemingly, the Court was of the view that appellants were prematurely attacking the assignment of teachers for the reason that Patricia Rogers and others of her class are high school students who are attending grades not yet reached in the orderly progress of the plan of integration. We are in accord. Certainly if there is in fact discrimination being practiced in teacher selection, pupils who are directly affected thereby, or the teachers themselves should be willing to intervene and seek a judicial determination of the question.

Moreover, in view of the good faith efforts of the Board and other school authorities to bring about complete integration, we are persuaded to hold that they should be afforded the initial opportunity of correcting the practice of employing teachers on a proscribed discriminatory basis, if in fact that practice prevails. If the Board and other school authorities fail or refuse to recognize and discharge their responsibility in this regard, we are confident that the trial court on motion or application of proper parties will accord the question prompt and effective consideration and will enter such order as the facts and circumstances justify and require.

*Attorney's fee issue.*

■ Finally, appellants contend that the Court's error in approving the revised plan extends to its denial of their motion for attorney's fees orally made at the conclusion of the trial. Applicable here is the general rule that the award of counsel fees lies within the sound discretion of the trial court, but like other judicial discretion, it is subject to review. Bell v. School Board of Powhatan County, Virginia, 321 F.2d 494 (4 Cir. 1963).

■ Judge Miller accorded the question due consideration, 232 F.Supp. pp.

843–844, and concluded that the "facts * * * do not justify the allowance * * *," and denied the motion. We have examined the question in the perspective of all the surrounding circumstances and are thoroughly convinced that there is no valid reason for holding that the Court's action resulted from an abuse of its discretion. The Bell case, supra, has vital and decisive distinguishing features. There the Court was obviously motivated by the "long continued pattern of evasion and obstruction which included not only the defendants' unyielding refusal to take any initiative, thus casting a heavy burden on the children and their parents, but their interposing a variety of administrative obstacles to thwart the valid wishes of the plaintiffs for a desegregated education."

In summary, therefore, we are satisfied that the action of the school authorities in their desegregation efforts "constitutes good faith implementation of the governing constitutional principles." Accordingly, the judgment must be and is affirmed.