Brenda Elaine BROWN et al.

v.

COUNTY SCHOOL BOARD OF FREDER-
ICK COUNTY, VIRGINIA, et al.

Civ. A. No. 642.

United States District Court
W. D. Virginia,
Harrisonburg Division.

Sept. 15, 1965.

S. W. Tucker, Tucker & Marsh, Richmond, Va., for plaintiffs.

Joseph A. Massie, Jr., Massie & Snarr, Winchester, Va., for defendants.

MICHIE, District Judge.

This is another segment of the school integration case involving Frederick County, Virginia. Briefly, the plaintiffs, Negro pupils in the public schools of Frederick County, first instituted this class action against the School Board of Frederick County and the other named defendants in September of 1962, seeking the admission of the named plaintiffs to specified white or predominantly white schools, an injunction against the operation of a bi-racial school system throughout the county, and an award of counsel fees. Subsequent to the institution of suit the Virginia Pupil Placement Board assigned all the plaintiffs to the schools of their choice, and I struck the action from the docket on July 22, 1963, on the ground that it had become moot, but with the proviso that it might be reinstated without payment of any filing fee in the event that subsequent developments should warrant it. The Court of Appeals reversed in a per curiam opinion, Brown v. County School Board, 327 F.2d 655 (4th Cir. 1964), and remanded the case to this Court for a consideration of the plaintiffs' prayers for an injunction against dual zone map assignment practices in the elementary schools of Frederick County and the practice of requiring Negro high school students to attend school in the City of Winchester, a separate school district, and the plaintiffs' prayers for counsel fees.

Thereafter, upon further evidentiary hearing in this Court, I concluded that the Frederick County School Board was making initial assignments of pupils in the school system on a racial basis though transfers had been freely granted upon request. The School Board was therefore actively engaged in perpetuating segregation, and an injunction against "any racial discrimination whatsoever on the part of the defendants in this case" was accordingly entered. Brown v. County School Board, 234 F.Supp. 808 (W.D.Va. 1964). However, the School Board was granted leave within a 60-day period to file with the Court a plan which would terminate all discriminatory practices, upon approval of which the injunction would be suspended and the School Board allowed to operate under the plan.

On the question of counsel fees, I concluded that there had been no long continued pattern of evasion and obstruction

to integration on the part of the defendants. The situation was thus distinguishable from the circumstances involved in Bell v. School Board, 321 F.2d 494 (4th Cir. 1963), where payment of counsel fees by the defendants was ordered. The prayer for counsel fees was therefore denied. While the plaintiffs urged that counsel fees be awarded in their second appeal to the Court of Appeals, the Court made no mention of the question in its opinion, Brown v. County School Board, 346 F.2d 22 (4th Cir. 1965), and the plaintiffs have not renewed the request upon remand to this Court. Under the circumstances I see no reason to alter the decision in my first opinion on this point, particularly in view of the pronouncements of the Court of Appeals in Bradley v. School Board, 345 F.2d 310, 321 (4th Cir. 1965), which seem to be largely in accord with the views I expressed in the earlier opinion.

Within the above-mentioned 60-day period the School Board came forward with a proposed plan. This plan, adopted by the Board on July 7, 1964, was adjudged insufficient. However, the Court, by order entered October 29, 1964, approved the plan on the condition that it be modified in certain particulars by the School Board. The plan was so modified and adopted by the School Board on November 5, 1964, and the Court thereafter approved the plan on November 18, 1964, and stated that the School Board would be deemed to be in compliance with the earlier injunction so long as the plan was carried out. This modified plan, entitled "A Plan for the Assignment of Children in a Non-Biracial School System in Frederick County, Virginia," will be hereinafter referred to as the plan of November 18.

The plan of November 18 was essentially of the variety known commonly as a "freedom of choice" plan. By its dictates, separate procedures were established for school children entering the public schools of Frederick County for the first time (those entering the first grade and those whose families had recently moved into the county) and for students previously enrolled in the public school system. The plan for the enrollment of new students required that Frederick County be divided into school districts based upon the geographical location of each school serving the area, the convenience of bus routes for the transporation of children to each school and the possible overcrowding of schools and schoolrooms. Children entering the public school system for the first time were to make application at the principal's office of the school serving them and were required to make application for admission to the school serving the area in which they lived or any other public school which they wished to attend or their parents wished them to attend. The School Board, through its Superintendent, was then ordered to make recommendation to the Virginia Pupil Placement Board that the applicant be assigned to the school of his choice, "provided the same is in accordance with and subject to the administrative policies of the School Board, such as school bus routes, school crowding, arrangements with other school divisions, tuition aid and other such administrative requirements."

Under the plan of November 18 the method for the assignment of students previously enrolled within the Frederick County School System and those Negro high school students residing in Frederick County who had previously been assigned to Douglas High School in the City of Winchester (the Frederick County School System at this time had no high school which regularly enrolled Negro students) required the Superintendent of Schools to conduct a registration prior to the close of the spring session each year. Each parent or guardian of a child previously enrolled in Frederick County or known to be residing in the county was to be sent, by mail or otherwise, a registration form to be filled out and returned by a date not less than seven days after the form was sent out. The parent or guardian was to indicate on this form the school in which he desired his child to be enrolled for the ensuing school year.

Within thirty days after these forms were returned, the Superintendent was to assign pupils for the coming school year and promptly notify the parent or guardian of his decision. This notice also advised the parent or guardian of his right to seek a review of the assignment by the School Board or by this Court. In making his assignments, the Superintendent was ordered to assign or place pupils in accord with the wishes of the parent or guardian as expressed in the registration form insofar as practicable, taking into account the location and capacity of school buildings, shifts in population and practical attendance problems, provided only that the race of the pupil concerned might not be a consideration. If any parent or guardian failed or refused to fill out the registration form within the specified time, the pupil was to be assigned by the Superintendent to the school in which the child was then enrolled or to the school nearest the child's place of residence, or to another school determined without regard to the child's race. Finally, the plan provided, as indicated above, for an appeal within twenty days of notification by any parent or guardian who felt aggrieved by his child's assignment. The appeal procedure required that the aggrieved party make application in writing to the School Board for review, setting out the relationship of the applicant to the pupil and the specific reasons why the pupil should not attend the school in which he had been placed and why he should be placed in another school named in the application. The School Board was then required to review the initial placement within twenty days after receipt of the application for review and make a ruling, a copy of which order would be furnished the applicant. The applicant, if he still felt aggrieved, might then petition this Court for review of the assignment. The plan concluded with a general statement that no administrative requirements could be based on discrimination against race, creed or color.

From the order of this Court approving the plan of November 18 the plaintiffs appealed to the Court of Appeals. However, between the time of approval of the plan of November 18 by this Court and the argument of the case before the Court of Appeals, the School Board of Frederick County made certain changes in its plan for the operation of the public schools for the school year 1965–66. The Court of Appeals was unable to determine the exact nature of the Frederick County plan from the record presented on appeal, and, describing it as "amorphous and incomplete," remanded the case to this Court for the purpose of making a determination of the detailed provisions of the School Board's plan for assignments for the next school year. Brown v. County School Board, 346 F.2d 22 (4th Cir. 1965).

Pursuant to this mandate of the Court of Appeals, a hearing was held in this Court on July 15. Assignments have been made for the 1965–66 school term and the practical effects of the Frederick County plan are now apparent. It is now my duty to rule upon that plan's constitutional merits.

The Frederick County School System, under its present plan of operation for the 1965–66 school term, will have a total of seventeen schools. Of these, fifteen are elementary schools ranging in size from two-room schools to schools housing from 500 to 600 pupils. One of these elementary schools has been and is an all-Negro school; the remaining fourteen are all or predominantly white in enrollment. There is one consolidated high school, James Wood High School, which will serve every county student in grades nine through twelve. One consolidated junior high, the new Frederick County Junior High School, will serve every county student in grades seven and eight. Inasmuch as there is no segregated schooling in grades seven through twelve, this segment of the Frederick County system may be eliminated from con-

sideration, as indeed the Court of Appeals indicated in its opinion.[1]

In addition, the Frederick County plan of desegregation for first grade pupils throughout the county may be removed from consideration at this point. All entering first graders in the system have been assigned to one of the fourteen elementary schools which will offer first grade classes for the 1965–66 school year on a geographical basis. There will be no racial separation. The county's other elementary school, the all-Negro Gibson Elementary School around which this action centers, will house no first grade classes for pupils first entering school,[2] and the plaintiffs have indicated no objections to the first grade plan.

The remainder of the Frederick County system, i. e., grades two through six, will remain on the freedom of choice plan of November 18 previously approved by this Court. It is the situation in these grades to which the plaintiffs object. .

It should be noted at the outset that the freedom of choice provisions upon which Frederick County will operate in 1965–66 are now scheduled to be used for one year only. The county plan for the year 1966–67 and thereafter will place grades two through six on a geographical plan identical to that presently in effect for the first grade. The all-Negro Gibson School will be closed down as an elementary school and used for administrative offices or for some type of special classes. The freedom of choice provisions are therefore only an interim measure.

The provisions of the School Board's plan, which the Court of Appeals found lacking in clarity, become insignificant in light of this fact. Since all assignments have been made under the plan for 1965–66, and since freedom of choice will not be used by the county thereafter, it is necessary only to look to the actual method of assignment for this year, and the result thereof, to rule upon the constitutional merits of the situation in Frederick County.

Implementation of the freedom of choice plan began last spring.[3] On April 22, 1965, an assignment application was sent to parents or guardians of all county students enrolled in schools for that year, whether attending school in the county or elsewhere. This very simple form required parents to indicate the school which they wished their children to attend in 1965–66. A period of fourteen days was allowed for the completion of these forms. Upon their return on May 6, the Superintendent of Schools made assignments of the pupils based, insofar as possible, on the requests of their parents. On June 2, 1965, the last day of the 1964–65 school term, the parents were informed of the assignments in writing on the back of the pupils' report cards. Another card was enclosed informing the parents of the right to appeal, in accordance with the dictates of the plan of November 18. Apparently

---

1. It is not clear whether any Negro high school aged residents of Frederick County will continue to attend Douglas High School in Winchester, where Negro students were assigned in the past. The record is clear, however, that they were informed by the school authorities that they would be assigned to James Wood High School, and if they wished to attend any school outside the Frederick County system they would have to make arrangements on their own. There would be no payment of tuition to other school districts on their behalf by Frederick County.

2. There will, however, be one or more Negro pupils at the Gibson school in the first grade. These are students who at-

tended Gibson in 1964–65 and who will be repeating the first grade in the same school pursuant to the requests of their parents under the freedom of choice plan hereinafter outlined.

3. The same procedure was followed for students who would enter grades seven through twelve in 1965–66, but freedom of choice to this group meant simply that they would attend the county's one junior or senior high school. There was therefore no choice to be made. In addition, parents enrolling children in the county's schools for the first time were required to indicate their preference of schools, but, as indicated above, the first grade was thereafter placed on a geographic plan to which the plaintiffs have no objections.

no parents felt aggrieved by the decision of the Superintendent; in any event, there were no appeals by any parent to this Court.

What were the practical results of the freedom of choice assignments? No figures were introduced into evidence indicating the exact number of Negro students in the second through the sixth grades who took advantage of their freedom of choice to attend the county's primarily white schools. Examination of the overall figures will give an indication of the effect, however. The total school age population of Frederick County is over 6,000 students. There are approximately 130 Negro students, or approximately two per cent of the total. Of these 130 Negro students 65, or one-half, will attend the Gibson school in 1965–66. Of the other 65, approximately 16 will attend primarily white elementary schools; the remainder will attend the county's junior and senior highs. These sixteen include first grade students assigned to these elementary schools on the geographic plan as well as those in grades two through six who will attend primarily white schools by the exercise of a freedom of choice.

■ It may thus be seen that a rather small number of Negro elementary students in the second through sixth grades chose to attend primarily white schools. However, I cannot infer from this fact that the plan which the school authorities have put into effect falls short of the constitutional standards imposed by the Fourteenth Amendment. Rather, the evidence indicates that the county's plan has been quite fairly administered. The evidence is quite clear that every application of a Negro student for assignment to a primarily white school was granted. In at least one particular the school authorities have gone past the requirements of the plan of November 18 to further integration. The Superintendent of Frederick County Schools testified that every Negro student who failed to return an assignment application was assigned, not to the Gibson school which

he had previously attended, but to a primarily white school closer to his home.

In operation, therefore, it appears that the actions of the school authorities of Frederick County have resulted in integrated schooling for all those elementary students in the second through the sixth grades who desired it. Even so, however, there appears to be a serious question as to whether the School Board's plan of operation, in its theory rather than in its practical results, meets constitutional standards. The Court of Appeals, in remanding here, indicated that it was dissatisfied with the state of the record as to whether the Frederick County authorities were operating a "dual zone" system of schools. The Court noted that "[t]here is no justification for superimposing a county-wide Gibson zone upon an otherwise acceptable plan of neighborhood zones." Brown v. County School Board, 346 F.2d 22, 23 (4th Cir. 1965).

The doubts which the Court of Appeals expressed as to the validity of the Frederick County plan were prompted by an affidavit of the Superintendent of Schools printed in the appendix to the brief filed in that court on behalf of the School Board. The Superintendent stated, in part: "Pupils will be assigned to a school serving the district in which they reside, unless their parents elect to send them to a school outside of the county, to a private school or apply for admission to another less-crowded school in the county."

The Court of Appeals commented, Brown v. County School Board, 346 F.2d 22, 23 (4th Cir. 1965):

On the face of the affidavit, the plan appears to be, in general, a geographic assignment plan, with restricted rights of transfer to all pupils, but with, so counsel indicated, unrestricted rights to Negro pupils seeking to attend a primary school heretofore attended solely by Negroes.

This statement by the Court of Appeals appears to be essentially correct insofar as the results under the school board's

plan of operation are concerned. All Negro students who desired to attend Gibson have been assigned there; there were, however, some denials of transfers desired by white students from one predominantly or all-white school to another school of the same racial composition. The statement appears to be incorrect, however, insofar as it indicates that pupils were originally assigned to schools on a geographic basis with superimposed rights of transfer. In actuality, as outlined hereinbefore, each student or his parent was first required to choose a school which the student wished to attend, or which his parents wished him to attend. In other words, the plan was originally implemented on a freedom of choice basis. Whatever geographic features the plan employs were then superimposed upon their freedom of choice.

█ █ It is well established in this Circuit and elsewhere that a freedom of choice plan, in which the school authorities allow the student, or his parents, to freely choose the school which he is to attend, is "an acceptable device for achieving a legal desegregation of schools." Bradley v. School Board, 345 F.2d 310, 318–319 (4th Cir. 1965), and cases cited therein, n. 17. Such a view is the logical result of the accepted principle that the Fourteenth Amendment does not outlaw voluntary separation of the races, but only discrimination which forces separation. Bradley v. School Board, 317 F.2d 429, 438 (4th Cir. 1963); Jeffers v. Whitley, 309 F.2d 621, 629 (4th Cir. 1962); Briggs v. Elliott, 132 F.Supp. 776, 777 (E.D.S.C.1955) (three-judge court on remand). While I am aware that the plaintiffs in the most recent Bradley decision have petitioned for certiorari in the United States Supreme Court, I must accept this most recent enunciation by the Court of Appeals as the current rule binding on this Court. It is also true that the minority in Bradley concurred in that decision on the hypothesis that freedom of choice is only an interim measure which will ultimately result in full integration. In the instant case, however, this hypothesis is a proven fact. Freedom of choice will be utilized in Frederick County for only one year because, if for no other reason, a sufficient number of Negro pupils have left the Gibson school to make its maintenance economically unjustifiable after the 1965–66 school term.

█ If freedom of choice per se is acceptable, what factors are present here which should cause the current Frederick County operation to be invalidated on Fourteenth Amendment grounds? Plaintiffs' counsel has attacked it as a "hybrid" variation of freedom of choice and therefore indefensible. If the variation referred to is the fact that the first grade is assigned on a geographic basis while grades two through six remain on freedom of choice, then the objection is patently without merit. If freedom of choice is acceptable for all grades, a plan which goes further toward total integration in one of those grades can hardly invalidate the freedom of choice plan in the others. If counsel had in mind the geographic features utilized in grades two through six, however, a more serious question is presented.

The Court of Appeals has stated that dual zoning may not be maintained. In Frederick County the fifteen elementary schools have been placed in nine "attendance areas." Five of these attendance areas contain only one elementary school. Two areas have three schools each, and two areas have two schools each. The Gibson school is in one of the two-school areas, along with the all or predominantly white Stonewall Elementary School.

Additionally, three of the attendance areas which contain more than one school have been divided into sub-attendance areas. In the fourth multiple school district, the one containing the Gibson and Stonewall schools, there are no sub-attendance areas. The reason for the different situation in the Gibson-Stonewall attendance area is quite plain. The Gibson school does not draw its students solely from the attendance area in which it is located. It is attended by Negro children throughout the county who de-

sire to go there. This was admitted by the Superintendent of Schools in his testimony at the hearing. Further, reference to the school bus routes of the two buses which serve the Gibson school shows that these buses traverse practically the entire north-south length of the county in its eastern half,[4] primarily along the corridor formed by U. S. Highway 11 which runs through the length of the county.

The effect of these attendance area lines is not entirely clear. They are, of course, used in assigning first grade students who attend school on a geographic basis. As to the other elementary grades, white students, as well as Negro, were required to indicate their preference of elementary schools on the freedom of choice plan. However, the Superintendent of Schools testified that some transfers requested by white students on the preference forms were denied on the basis of the distance of the desired school from the students' homes and overcrowding of the desired school. Inasmuch as the Frederick County elementary schools have been relieved of approximately 500 pupils by the establishment of the new Frederick County Junior High School for all county seventh and eighth graders, it is unlikely that many of these denials were based on the overcrowding of schools. It now appears that only two transfers by white students were denied because of the unavailability of school buses going from the area of the student's home to the school which he desired to attend. There was no evidence introduced which indicates that students were denied admission to a desired school solely because it would involve the crossing of a district line.

In point of fact, however, school bus routes for buses serving all elementary schools in the county except Gibson run, for the most part if not entirely, throughout only one attendance area. The conclusion is therefore inescapable that the elementary schools of Frederick County are operating essentially on a geographic basis, with the exception of the Gibson school.

The central point involved in this case is therefore whether the foregoing fact invalidates a plan which would otherwise be a valid freedom of choice method of desegregation. I have concluded that the instant plan is not a dual zoning scheme of the type proscribed by the Court of Appeals.

The infirmity in what has become known as dual zoning, as I understand it, is the element of initial *compulsory* assignment of Negro students on a basis different from that used in assigning white students. See, e. g., Dodson v. School Board, 289 F.2d 439, 443 (4th Cir. 1961). In such a situation, where Negro students are initially assigned by the School Board on the basis of a different standard from that used for white students, i. e., initially assigned to a segregated school, the requirements of the Fourteenth Amendment are not met by thereafter allowing Negro students to transfer out of these segregated districts. To meet constitutional standards, the original assignment must be non-discriminatory. "[F]reedom of transfer out of a segregated system is not a sufficient corrective in this Circuit. It must be accompanied by an elimination of discrimination in handling initial assignments." Nesbit v. Statesville City Board of Education, 345 F.2d 333, 334 (4th Cir. 1965); Bradley v. School Board, 345 F.2d 310, 319 (4th Cir. 1965); Buckner v. County School Board, 332 F.2d 452 (4th Cir. 1964). "When a school board seeks the Court's approval of a plan proffered as being in complete compliance with the law's requirements, * * * a court ought not put its stamp of approval upon it if initial assignments are both racial and compulsory." Nesbit v. Statesville City Board of Education, supra, 345 F.2d at 334–335, n. 3.

The factual situation in Frederick County does not fit within the above proscription. As indicated hereinbefore,

4. There are no Negro students residing in the attendance areas which draw from the western and northernmost sections of the county.

initial assignments to schools were made, not on a compulsory and racial basis, but upon the indicated preference of the county pupils and their parents. In short, whatever assignment restrictions are involved here have absolutely no effect on the furtherance, or the hindrance, of racial desegregation. In such a case it would be ludicrous to hold that the Frederick County plan of desegregation is invalidated at the instance of the Negro plaintiffs because there is a geographic limitation placed upon white students wishing to attend a predominantly or all-white school further from their homes, while Negro students are allowed to attend an all-Negro school further from their homes than a predominantly white school which they may attend if they so desire. Indeed, such a holding would of necessity invalidate every freedom of choice plan in effect in predominantly rural areas throughout the country. In those areas a vast majority of students are transported to school by school buses, just as they are in Frederick County. In such areas freedom of choice can never be complete for all pupils. Whether or not attendance area lines are drawn, the economics of school transportation in these rural areas decrees that pupils in one area of the county must attend a school located relatively close to home. Students might be allowed to attend schools farther from home if they were able to provide their own transportation, but in areas where school buses are the accepted method of commuting to school, such a concession would be, for the most part, an empty gesture.

I hold, therefore, that the instant plan for the 1965–66 school term is not invalid as a dual system of zoning. While I have found no authority in the Court of Appeals on this point, the conclusion which I reach is substantially identical in its rationale with the well reasoned opinion of Chief Judge Thomsen in the Harford County, Maryland case. Pettit v. Board of Education, 184 F.Supp. 452, 456–458 (D.Md.1960).

■ I have also concluded that the plan is not invalid under the principles of the minority transfer rule. Under that rule, desegregation plans have been invalidated where there had been initial non-discriminatory assignments of students but where students who were in a racial minority were allowed to transfer to a school where they were in a racial majority. The plans were invalid because

[n]ot only is race the factor upon which the transfer plans operate, but also the plans lack a provision whereby a student might with equal facility transfer from a segregated to a desegregated school.

Goss v. Board of Education, 373 U.S. 683, 688, 83 S.Ct. 1405, 1409, 10 L.Ed.2d 632 (1963); Dillard v. School Board, 308 F.2d 920 (4th Cir. 1962).

I have examined these cases and I conclude that the proscription therein announced does not cover the instant situation. The minority transfer rule invalidates an obvious attempt to promote segregation by allowing transfers out of an integrated school by those in a racial minority. Such a plan is one of segregation, not of integration. "[N]o official transfer plan or provision of which racial segregation is the inevitable consequence may stand under the Fourteenth Amendment." Goss v. Board of Education, supra, 373 U.S. at 689, 83 S.Ct. at 1409. It must be remembered that the instant plan is one which has resulted in greater integration, not segregation. It is not a one-way street to segregation. Here, unlike the Goss and Dillard situations, the freedom of choice plan allows a Negro student the initial opportunity to attend a desegregated school as easily as an all-Negro school, and race is not a factor which conditions the choice which a student or his parents is allowed to make. See Goss v. Board of Education, supra, at 688, 83 S.Ct. at 1409, where Justice Clark speaking for the Court indicates that the Court's holding does not say "that appropriate transfer provisions, upon the parents' request, consistent with sound school administration and not

based upon any state imposed racial conditions, would fall." Apparently a white or Negro student living in the same attendance area would have exactly the same choice of schools which he might attend, i. e., the all or predominantly white school for his area or the all-Negro Gibson school. It may be, however, that a Negro would be allowed to attend any school in the county. The record is not entirely clear on this point. If this latter suggestion is the case then, as the Court of Appeals noted, the plan for 1965–66 does "raise novel questions as to the application of the proscription against minority transfers when the complainants are those to whom the greater rights are given." Brown v. County School Board, 346 F.2d 22, 24 (4th Cir. 1965). I have no hesitation, however, in concluding that there is no discrimination against the plaintiffs based on the minority transfer rule. It can hardly be contended that members of the plaintiff class have standing to complain because other members of the plaintiff class have voluntarily chosen to attend an all-Negro school for the 1965–66 school term.

■ The problem with which the Negro plaintiffs are confronted in the instant case is simply that some members of their class have not chosen the road to immediate integration, as have the plaintiffs. For their own reasons, they have chosen to attend the Gibson school for another year. To overcome this adverse effect on total integration, the plaintiffs have argued that it is the duty of the School Board to promote integration. The burden should not fall upon the Negro community. Unquestionably, this principle is sound. Buckner v. County School Board, 332 F.2d 452 (4th Cir. 1964); Bell v. School Board, 321 F.2d 494, 499 (4th Cir. 1963). But the principle must be read in the light of the factual setting of the cases in which it has been uttered. Where, as here, the School Board has shouldered the burden of integration by giving every student in the area his choice of schools, where

this choice can be made intelligently on the basis of information furnished by the School Board to each student and his parents, and where no burdensome administrative obstacles are placed in the way of integration, the duty of the school authorities has been met. This is, I believe, the plain meaning of the most recent Bradley decision, Bradley v. School Board, 345 F.2d 310 (4th. Cir. 1965). "A system of free transfers is an acceptable device for achieving a *legal* desegregation of schools. * * * Imposed discrimination is eliminated as readily by a plan under which each pupil initially assigns himself as he pleases as by a plan under which he is involuntarily assigned on a geographic basis." Id. at 318–319 (Emphasis added).

■ The plaintiffs have sought to avoid the effect of the Bradley decision by the argument that its principle applies only in those areas where there are a large number of Negro students and where, therefore, greater problems are placed in the path of integration. In Frederick County, as well as in other areas of the Western District of Virginia where the Negro population is quite small, it is argued that freedom of choice plans cannot be justified constitutionally. Complete integration can be reached more swiftly by a geographic plan where there are no administrative difficulties. The answer to this argument is contained within the Bradley decision, however. As I understand the majority opinion, freedom of choice in and of itself satisfies the dictates of the Fourteenth Amendment. Freedom of choice is a satisfactory means of achieving a "legal desegregation of schools." The constitutional merits of the plan do not depend upon the number of students of the Negro race in the county, or, indeed, upon the number who elect to attend integrated schools. If freedom of choice meets the requirements of the Fourteenth Amendment as a final plan of legal desegregation in one area, it should likewise be constitutional in any other area.[5]

---

5. It is therefore unnecessary to delve into the question of whether the lapse of an
additional year's time before complete integration will be achieved under the

However the issue may be worded, it is clear that the plaintiffs in this case are simply asking this Court to force the school authorities to force Negro students into totally integrated county schools which they have voluntarily chosen not to attend. The rationale for such action on my part would apparently be the psychological and sociological underpinnings of the Brown opinion, i. e., that schooling in which Negroes and whites are separated is "inherently unequal." Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Based on the premise that integrated schooling is always better than segregated schooling, it would be my duty to force unenlightened Negro students, or the children of unenlightened parents, into integrated schools against their will. I do not believe this to be my duty, however. I do not believe the Federal courts have the power to force local school boards to force Negro students into integrated schools when they have chosen not to go there,[6] but of course with the reservation that the election made by the student or his parents must be on the basis of a fair choice, made with full knowledge of his alternatives. Indeed, the contrary view is in direct contradiction to the established principle that the Brown decision did not require school authorities "to effect a general intermixture of the races in the schools * * *." Bradley v. School Board, 317 F.2d 429, 438 (4th Cir. 1963); Jeffers v. Whitley, 309 F.2d 621, 629 (4th Cir. 1962). The same principle was clearly enunciated in the most recent Bradley decision. Faced with the argument that states may not "permit" segregation, and that there are a sufficient number of Negro parents who will desire that their children attend all or predominantly Negro schools to result in the continuance of some schools attended only by Negroes, the court replied:

It has been held again and again, however, that the Fourteenth Amendment prohibition is not against segregation as such. The proscription is against discrimination. Everyone of every race has a right to be free of discrimination by the state by reason of his race. There is nothing in the Constitution which prevents his voluntary association with others of his race or which would strike down any state law which permits such association. The present suggestion that a Negro's right to be free from discrimination requires that the state deprive him of his volition is incongruous.

Bradley v. School Board, 345 F.2d 310, 316 (4th Cir. 1965).

Within the confines of freedom of choice, however, it is clear that school authorities are required to administer the plan in a manner sympathetic to desegregation. Freedom of choice may not be used as "merely a strategic retreat to a new position behind which the forces of opposition [to desegregation] will regroup. * * * A procedure which might well succeed under sympathetic administration could prove woefully inadequate in an antagonistic environment. The procedure cannot be separated from the spirit that produced it and will motivate its application." Id. at 322 (opinion concurring in part, dissenting in part).

In this vein, the manner in which school districts assign teachers to

---

plan is justifiable. If, however, as the minority opinion in Bradley indicates, freedom of choice is only an acceptable interim measure for overcoming particular obstacles to total integration in given areas and not sufficent in and of itself, it would appear that there is no justification for freedom of choice in Frederick County. The Superintendent of Schools testified at the hearing that no adminis-

trative difficulties existed which would bar the way to complete integration on a geographic basis in 1965–66.

6. There is, of course, no doubt that the school board may force integration against the will of the student or his parent pursuant to a reasonable geographical plan. However, quite a different matter is presented when this Court is asked to do so on constitutional grounds.

the various schools will undoubtedly take on a great significance. "In a particular factual setting, it may be contended that consideration of race in the assignment of teachers and staff coerces the pupils and effects a discrimination against them." Bradley v. School Board, supra, at 320. The Court of Appeals did not elaborate on what sort of factual showing would be necessary to infer that students are being coerced. I do not believe, however, that a freedom of choice plan in which only a small percentage of Negro students have chosen to attend integrated schools could be approved under the Fourteenth Amendment if it were shown that Negro and white teachers and staff were continually and systematically assigned only to schools where their race predominated. In such a situation the school authorities would have fallen short of the leadership in desegregation required of them by the courts. I believe there is a great deal of truth in the statement, made before me recently, that the presence of all Negro teachers in a school attended solely by Negro pupils in the past denotes that school a "colored school" just as certainly as if the words were printed across its entrance in six-inch letters. The ideal to which a freedom of choice plan must ultimately aspire, as well as any other desegregation plan, is that school boards will operate "schools," not "Negro schools" or "white schools."

■ In the context of the present case, three Negro teachers staff the Gibson school. There are no white teachers in Gibson, nor are there any Negro teachers at any other county school. Coupled with the fact that school bus routes continue to run from the several rather widely separated Negro communities in Frederick County to the Gibson school, it is quite clear that the choice of Gibson is an easy one for a Negro parent to make for his child. I

have concluded, however, that I should not upset the school plan for 1965–66 on this ground. The School Board has been complying in good faith with the plan of November 18 approved earlier by this Court and has in fact gone past that plan to assure total integration in 1966–67. Students and staff have just begun classes for this term, the last and only year of freedom of choice there, and it would do more harm than good to alter the school program now in progress. I am also mindful of the straightforward statement of the Superintendent of Schools of Frederick County that freedom of choice was not being used there to avoid employing these Negro teachers in predominantly white schools this year, and that the School Board planned to use all its teachers when it switched to the geographic plan in 1966–67.[7] I cannot ignore the fact that those who have suffered the greatest hardships as a result of school integration have been the Negro teachers whose jobs have been lost in the backwash created by the closing of Negro schools.

I therefore approve the freedom of choice plan of operation in Frederick County for 1965–66 and the change-over to a geographic plan to be used thereafter. However, since the plan of desegregation to which the defendants have committed Frederick County has not yet been brought to its full fruition, this case will be placed on the inactive docket of this Court and may be reinstated on the active docket without the payment of any filing fee in the event that any of the plaintiffs or anyone who would have had a right to intervene in this cause had it remained on the active docket shall file a petition for reinstatement and/or intervention stating a claim which would have given such plaintiff or intervenor a right to re-open the case or intervene had the case remained on the active docket. The injunction against racial discrimination

7. This testimony was heard over the objection of the defendants that an inquiry into the School Board's plan for teacher assignments was not germane under the complaint. I think it is now well established that school pupils have standing to raise this question to the extent it involves an asserted denial of constitutionally protected rights of the pupils. Bradley v. School Board, 345 F.2d 310, 320 (4th Cir. 1965), and cases cited therein, n. 21.

against the defendants will remain in effect, but as long as the freedom of choice and geographic plans approved by this Court are adhered to the defendants will be deemed to be in compliance with the injunction. Upon implementation of the final geographic plan in September of 1966, the defendants may move this Court for dissolution of the injunction and final dismissal of this cause.

This opinion has now reached a length far beyond that which I had intended at its commencement, and beyond which the narrow scope of the problem in Frederick County would seem to warrant. However, the questions presented herein will be met by school boards throughout the Western District of Virginia which have chosen the freedom of choice method of desegregation in order to comply with the requirements of the Department of Health, Education and Welfare for the distribution of federal funds for education. It is hoped that the opinions expressed herein will be of some benefit to these authorities in determining what requirements they must legally meet for the approval of their plans here.

An order will be entered in accordance with the rationale of this opinion.