Terry KIER, etc., et al., Plaintiffs,

v.

COUNTY SCHOOL BOARD OF AUGUSTA COUNTY, VIRGINIA, et al.,
Defendants.

No. 65–C–5–H.

United States District Court
W. D. Virginia,
Harrisonburg Division.

Jan. 5, 1966.

See also D.C., 249 F.Supp. 249.

S. W. Tucker, Tucker & Marsh, Richmond, Va., Jack Greenberg, James M. Nabrit, III, New York City, for plaintiffs.

W. B. Timberlake, Jr., Timberlake, Smith & Thomas, Staunton, Va., Henry T. Wickham, Tucker, Mays, Moore & Reed, Richmond, Va., for defendants.

MICHIE, District Judge.

This is a school integration suit brought as a class action on behalf of the infant plaintiffs and others similarly situated, all Negro students in the public schools of Augusta County, Virginia, by their parents and next friends, residents and taxpayers of the county, against the County School Board and Superintendent of Schools. The cause came on for hearing before the Court on August 27, 1965.

Geographically Augusta County is located in the Shenandoah Valley of Virginia. Much of its area lies within the George Washington National Forest, and it is bordered on the west by Highland County, Virginia, and the West Virginia state line. As is the case in most of the Valley area, the Negro population of Augusta County is quite small. Of a total of over 10,000 school children in the county, only slightly over 500, or five per cent, are Negro.

The facts presented for the Court's consideration are not complicated. The defendant school authorities presently operate 19 elementary schools, one junior high or "intermediate" school (serving grades six through nine for students residing in the northwest section of the county), and five high schools. Of these schools, two elementary schools, the Cedar Green Elementary School and the

Oak Grove Elementary School, and one high school, Central Augusta High, must be classified as "Negro schools" in that all students and teachers in these schools are Negroes.[1] Indeed, the Superintendent of Schools testified that Central Augusta was constructed in 1962 specifically for use as a "Negro school." It is this situation to which the plaintiffs object.

Prior to the current 1965–66 school session, a small number of Negro students, approximately eighteen, were in attendance in formerly all-white schools pursuant to their requests for transfer or initial enrollment. In preparation for the 1965–66 session the school authorities in Augusta took their first affirmative steps to bring about a legal desegregation of the county's schools. In an attempt to comply with the requirements of the Office of Education, United States Department of Health, Education and Welfare, for the distribution of federal funds for education, the County School Board submitted its "Statement of Policies and Plans for Compliance Under Title VI of the Civil Rights Act of 1964" on May 28, 1965. The plan, in essence, provided for a three-year period of desegregation, beginning in the current school year, on a "freedom of choice" basis. For 1965–66 each parent or guardian of a pupil who would be in the first, seventh, ninth or twelfth grades was informed that his child might be enrolled in any school in the county serving that grade. After notice and time to decide which school his child should attend, the parent or guardian was required to affirmatively select the school. The school authorities then assigned students to the chosen schools up to the maximum capacity of the facilities. In the event of overcrowding in any particular facility, proximity to the school's location was to be the determining factor. In those grades other than the four in which an affirmative

choice was required, all students were to be routinely reassigned to the school which they attended in the prior school year. Parents or guardians might request a transfer for their children, but it would be up to these individuals to take the initiative in changing schools.

The plan provided that four additional grades would be placed on freedom of choice in 1966–67, and the last four grades would be similarly treated in 1967–68.

Prior to the promulgation of this plan the plaintiffs had instituted suit here. The plan was accordingly presented to the Court for approval at the hearing. However, on November 23, 1965, I was advised by letter from counsel for the defendants that the Augusta County School Board had amended its plan as originally submitted in order to comply with the requirements of the Department of Health, Education and Welfare. The entire student population of Augusta County has now been re-registered under the freedom of choice plan and the Department has approved the program. The issue now pending before me, therefore, is the constitutional merit of this plan which has allowed freedom of choice to every student in Augusta County.

█ I must, at the outset, reject the basic premise upon which the plaintiffs have chosen to press their cause. The plaintiffs contend that freedom of choice, per se, is not constitutionally acceptable as a final plan of desegregation where there are no administrative difficulties barring the way to complete integration on a unitary geographic basis. Freedom of choice, they argue, is defensible only where its practical result is the effectuation of a better "balance" between the races in a given school district, i. e., where freedom of choice can overcome the problem of de facto segregation in urban areas with clearly delineated Negro communities. Such was the situation

1. There is one exception. The Superintendent of Schools testified that one white instructor would teach at Central Augusta High this year, as has been the custom in the past. This instructor, teaching safety and driver education, divides his time between Central Augusta and one of the predominantly white high schools.

to which the Court addressed itself in Taylor v. Board of Education, 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), where the principle of freedom of choice was approved. In Augusta County, the plaintiffs assert, there are no such problems of de facto segregation, and therefore there is no justification for freedom of choice in the instant case.

■■ The plaintiffs' argument, however, whatever its merit, is addressed to the wrong forum. "A system of free transfers is an acceptable device for achieving a legal desegregation of schools. * * * Imposed discrimination is eliminated as readily by a plan under which each pupil initially assigns himself as he pleases as by a plan under which he is involuntarily assigned on a geographic basis." Bradley v. School Bd., 345 F.2d 310, 318–319 (4th Cir. 1965), vacated and remanded on other grounds, 86 S.Ct. 224 (1965). The decision of the Fourth Circuit is, of course, binding on me, and I have previously applied the rule of Bradley to approve freedom of choice as a plan of desegregation in Frederick County, Virginia. Brown v. County School Bd., 245 F.Supp. 549 (W.D.Va.1965). The percentage of Negroes to total population in Frederick County was smaller even than the percentage in Augusta County, and, as here, the Negro community was spread throughout the county. A geographic plan could therefore have been utilized in Frederick County with minimal difficulty to bring about complete integration. It is significant to note that the Court of Appeals, in remanding an earlier decision in the Frederick County case, had specifically stated that the schools might be operated under a system of free assignments and free transfers (freedom of choice). Brown v. County School Bd., 346 F.2d 22, 23 (4th Cir. 1965). It is true that the school authorities in Frederick County informed this Court that they would change over to a strictly geographic plan after an additional year of freedom of choice, but the interim nature of the freedom

of choice plan was not essential to its approval. Such is the teaching, as I understand it, of the majority opinion in Bradley.

■ As I remarked in the Frederick County opinion, the acceptability of freedom of choice as a device for legal desegregation is but a corollary of the principle that the Fourteenth Amendment does not prohibit voluntary separation of the races, but only discrimination which forces separation. This principle was first enunciated by Circuit Judge Parker in Briggs v. Elliott, 132 F.Supp. 776, 777 (E.D.S.C.1955) (Three-Judge Court). Stated differently, the principle simply means that school authorities have the right to be "color blind" so far as Fourteenth Amendment requirements are concerned, i. e., they are under no constitutional duty to bring about a general intermixture of the races or any particular "racial balance" in the public schools. As such, the principle has been consistently reaffirmed in this circuit. See, e. g., Bradley v. School Bd., 317 F.2d 429, 438 (4th Cir. 1963); Jeffers v. Whitley, 309 F.2d 621, 629 (4th Cir. 1962). In a wide spectrum of factual contexts the same proposition has found support in other circuits. E. g., Rogers v. Paul, 345 F.2d 117, 124–25 (8th Cir. 1965), vacated and remanded on other grounds, 86 S.Ct. 358 (1965); Downs v. Board of Educ., 336 F.2d 988, 998 (10th Cir. 1964), cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965); Stell v. Savannah-Chatham County Bd., 333 F.2d 55, 59 n. 2 (5th Cir.), cert. denied, 379 U.S. 933, 85 S. Ct. 332, 13 L.Ed.2d 344 (1964); Evers v. Jackson Municipal Separate School Dist., 328 F.2d 408, 410 (5th Cir. 1964); Bell v. School City, 324 F.2d 209, 213 (7th Cir. 1963), cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964); Taylor v. Board of Educ., 294 F.2d 36, 47 (2d Cir.) (dissenting opinion), cert. denied, 368 U.S. 940, 82 S. Ct. 382, 7 L.Ed.2d 339 (1961); Kelley v. Board of Educ., 270 F.2d 209, 226 (6th Cir.), cert. denied, 361 U.S. 924, 80 S. Ct. 293, 4 L.Ed.2d 240 (1959).

There is substantial authority to the contrary.[2] The plaintiffs place reliance upon the statement by Judge Wisdom in Singleton v. Jackson Municipal Separate School Dist., 348 F.2d 729, 730 n. 5 (5th Cir. 1965), that Judge Parker's utterance in Briggs v. Elliott "should be laid to rest" as "inconsistent with Brown [Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)] and the later development of decisional and statutory law in the area of civil rights." Judge Wisdom's cryptic comment was uttered, however, as a footnote to a decision ordering the acceleration of a grade-a-year desegregation plan and must be read in that factual context. If the statement means that school authorities may not intentionally establish and operate a "Negro school," even where the Negro student has the option of attending a "white school," then I am quite in accord. If, on the other hand, the statement is authority for a rule which would require the Federal courts to force local school boards to adopt a plan calling for a maximum of racial intermixture in lieu of a voluntary plan, fairly applied, which would result in a removal of all board-imposed restrictions on desegregation, then I must, with all deference, note my dissent. However, I do not think the latter construction is intended by the Fifth Circuit; I do not believe Judge Wisdom's opinion calls for rejection of the freedom of choice principle as a mandate of the Fourteenth Amendment. My view is buttressed by the recent Fifth Circuit cases which have continued to express the opinion that voluntary separation is legally permissible. Stell v. Savannah-Chatham County Bd., supra, 333 F.2d at 59 n. 2; Evers v. Jackson Municipal Separate School Dist., supra, 328 F.2d at 410.

■ It may be contended that freedom of choice, applied in an area where racial separation has historically been the custom, will not, without more, adequately erase the discrimination of the past, i. e., that Negro children or their parents are unable or unwilling to take advantage of whatever benefit attending a predominantly white school might bestow upon the children. Indeed, this is exactly what the plaintiffs argue here. Unquestionably, to be constitutionally acceptable, a freedom of choice plan will impose upon the school boards additional duties not required under a geographic plan. The ground rules must be laid in a way which will not discourage desegregation, and students and their parents must be fully informed of their choices. Burdensome administrative tasks will be involved on the part of the school authorities. Further, a greater emphasis must be placed on faculty and staff desegregation in order to encourage the pupil desegregation process. But the Bradley decision in this Circuit clearly stands for the proposition that freedom of choice is a constitutionally acceptable plan for a legal desegregation of schools. In the absence of some overwhelming factual consideration such as, e. g., widespread hostility in the white community which might result in economic or other reprisals to a Negro parent who assumes the initiative in sending his child to a predominantly white school, I must follow the Bradley rationale.

The Supreme Court has not ruled upon the merits of freedom of choice per se. It is significant, however, that the Court, in declaring the "minority transfer rule"

2. See, e.g., Blocker v. Board of Educ., 226 F.Supp. 208 passim (E.D.N.Y.1964); Branche v. Board of Educ., 204 F.Supp. 150, 153 (E.D.N.Y.1962); Jackson v. Pasadena City School Dist., 59 Cal.2d 876, 881–82, 31 Cal.Rptr. 606, 609–10, 382 P.2d 878, 881–82 (1963) (dictum). The discussion in the latter decision may, however, be based upon considerations of state policy rather than those of the Fourteenth Amendment.

These decisions, like some of those of the contrary view cited in the text, deal with the de facto segregation problem under a geographic zoning plan with no right to transfer. While the constitutional principle in that situation and in the instant case is identical, there is undeniably a harsher situation presented where, unlike here, the plaintiffs have no opportunity to avoid attendance at a substantially all-Negro facility.

constitutionally invalid in Goss v. Board of Educ., 373 U.S. 683, 687, 83 S.Ct. 1405, 1408, 10 L.Ed.2d 632 (1963), was careful to distinguish a plan allowing free transfers regardless of race.

> [W]e note that if the transfer provisions were made available to all students regardless of their race and regardless as well of the racial composition of the school to which he requested transfer we would have an entirely different case. Pupils could then at their option (or that of their parents) choose, entirely free of any imposed racial considerations, to remain in the school of their zone or to transfer to another.

 The quoted language, I believe, suggests approval of a plan of voluntary transfers out of board-imposed zones, so long as transfers are to be granted irrespective of race. I need only note, in addition, that the Fourth Circuit has held that the existence of a system of geographic zones is not a condition precedent to the approval of freedom of choice. Bradley v. School Bd., supra, 345 F.2d at 318. I conclude that freedom of choice, fairly applied, is constitutionally sound in a rural area where its result may be less integration than under a geographic plan as well as where it is used to overcome the effects of de facto segregation in an urban community.

Having reaffirmed the principle of freedom of choice in the assignment of students, it is necessary only to examine the mechanics of Augusta County's plan to ascertain whether it is fairly applied. As I have heretofore noted, the plaintiffs have chosen to make a frontal assault on freedom of choice per se. No evidence was offered on their behalf indicating any attempt by the defendants to perpetuate racial separation by the utilization of unfair methods in pupil assignments within the confines of freedom of choice. To the contrary, the plan filed by the defendants with the Court called for the distribution of a letter through the schools to all students who would be in the seventh, ninth or twelfth grades for the current year and (presumably through the mail) to the parents of all children known to be entering the county schools for the first time.[3] Notice of the plan was also given students and parents in the Staunton News Leader, a paper of general circulation in the area, on Sunday, May 16, 1965, and by announcements through the various other news media serving the area. Students and parents were allowed until June 15, 1965, to make their choices of schools. It therefore appears that the school authorities made a good faith effort to inform the population of the county as to their prerogatives under freedom of choice and that adequate time was given for the exercise of the prerogative last spring. While no evidence is before me as to the re-registration this fall, I presume that adequate notice and time were given to students and parents then.[4] The plan as presented before the Court calls for yearly exercise of freedom of·choice in the future, each child or his parent being required to exercise his choice by June 1. On the assumption that the local news media will be fully utilized for advertisement in the future, and that the authorities will continue to advise the pupils and their parents of their right to attend any school in the system serving their grades, that assignment forms will continue to be distributed yearly to every child or his parent insofar as possible, and specifically on the condition that not less than fifteen days be given for the exercise of a choice of schools, I approve these aspects of the freedom of choice plan.

3. The plan, as noted above, originally called for desegregation of four grades per year. I assume that the same general plan was followed when all grades in the system were placed on freedom of choice this fall after the hearing in this matter.

4. This presumption is buttressed by the fact that the plan was approved by the Department of Health, Education and Welfare following the re-registration.

Several subsidiary points raised by the plaintiffs must be disposed of. The plaintiffs have attacked the plan as a proscribed "dual zoning" system. It is sufficient to note that there are no attendance zones affecting this freedom of choice plan. Each child initially assigns himself. Bradley v. School Bd., supra, 345 F.2d, at 318–319, clearly approves this practice.

Each child, as the Superintendent of Schools testified, has the absolute right to go to any school serving his grade in the county. This is hemmed in, as a practical matter, by the lack of public school transportation between widely separated sections of the county. It is also true that buses for the presently all-Negro Central Augusta High School and Cedar Green Elementary School traverse practically the entire county while buses serving the predominantly white schools cover a more compact geographical area. Admittedly, this fact is a vestige of the days of dual zoning in the county schools. I do not, however, believe this factor can upset an otherwise valid freedom of choice plan. Any Negro child has the option of attending a predominantly white school. All children were assigned to the schools of their choice for the current school year. Presumably, when Negro students decide to attend predominantly white schools closer to their residences than Central Augusta or Cedar Green, the wide areas of circulation for buses serving these two schools will come into line with the more compact areas served by buses traveling to the county's other schools.

Finally, the plaintiffs have sought to show constitutional deprivation of Negro high school students by the fact that Central Augusta is substantially smaller than the county's other high schools.[5] Evidence was adduced from examination of the Superintendent of Schools that smaller high schools are disadvantageous as far as course offerings are concerned. Again, however, this will not serve to upset an otherwise valid freedom of choice plan. Negro children are free to attend a larger high school if they so desire.

I therefore conclude, on the assumptions heretofore made for the plan of operation in the future under freedom of choice, that the Augusta County mode of assignment for all pupils in the system meets constitutional requirements.

Turning to the question of the assignment of teachers, however, a different situation is presented. With but one exception not significant here, all teachers and administrative personnel in the three county schools attended solely by Negro students are Negroes. No Negro teachers or administrative staff are employed in the predominantly white schools. The effect of this situation is quite clear. The defendants, by the segregation of teachers, continue to maintain three clearly-delineated Negro schools. "[T]he presence of all Negro teachers in a school attended solely by Negro pupils in the past denotes that school a 'colored school' just as certainly as if the words were printed across its entrance in six-inch letters." Brown v. County School Bd., 245 F.Supp. 549, 560 (W.D.Va.1965).

The law is well-established that school pupils have standing to raise the question of teacher assignments to the extent such assignments constitute an asserted denial of constitutionally protected rights of the pupils. E. g., Bradley v. School Bd., supra, 345 F.2d at 320; Rogers v. Paul, supra, 345 F.2d at 125; Northcross v. Board of Educ., 333 F.2d 661, 666–667 (6th Cir. 1964).

In the Bradley decision, however, the Court of Appeals, two judges dissenting, concluded that an inquiry into teacher assignments was within the discretion of the District Court. The Fourth Circuit therefore refused to hear argument on the question, since it had not been considered by the District Judge, as "[t]he possible relation of a reassignment of teachers to protection of the

5. Central Augusta, from the defendants' brief, has about 200 students this year.

Other high schools in the county have 500 to 600 or more students.

constitutional rights of pupils need not be determined when it is speculative." Bradley v. School Bd., supra, 345 F.2d at 320.

The decision of the Fourth Circuit was vacated and remanded per curiam on this point by the Supreme Court and the case was remanded to the District Court for a hearing on teacher assignments. In so doing, the Supreme Court commented that "[t]here is no merit to the suggestion that the relation between faculty allocation on an alleged racial basis and the adequacy of the desegregation plans is entirely speculative." Bradley v. School Bd., 86 S.Ct. 224 (1965).

In the instant case the plaintiffs' complaint clearly prays for relief from discriminatory practices in the assignment of teachers and administrative personnel. The plaintiffs, however, did not attempt to introduce any evidence of actual coercion of Negro students by the segregation of teachers in the county system. In some instances in other courts the Negro plaintiffs have attempted to show actual adverse effects resulting from segregated faculties. E. g., Monroe v. Board of Comm'rs, 244 F.Supp. 353, 364 (W.D.Tenn.1965). And the view taken by the Fourth Circuit in the Bradley decision would tend to support the view that the plaintiffs must show some actual adverse effect on desegregation flowing from faculty assignments. See Bradley v. School Bd., supra, 345 F.2d at 320.

■ I have concluded, however, that where the plaintiffs have shown the existence of segregated faculties the necessity for proof of actual adverse effects on Negro children flowing therefrom is obviated. While the Supreme Court has not specifically so held, I believe such a rule is fairly implied in the Court's statement that there is no merit in the contention that the relation between faculty segregation and the adequacy of a desegregation plan is "entirely speculative." Bradley v. School Bd., supra, 86 S.Ct. 224.

■ Where, as here, the school authorities have chosen to adopt a freedom of choice plan which imposes upon the individual student, or his parent, the duty of choosing in the first instance the school which he will attend (and where the burden of desegregating is imposed upon the individual Negro student or his parents), it is essential that the ground rules of the plan be drawn with meticulous fairness. "The ideal to which a freedom of choice plan must ultimately aspire, as well as any other desegregation plan, is that school boards will operate 'schools,' not 'Negro schools' or 'white schools.'" Brown v. County School Bd., supra, 245 F.Supp. at 560. See Bradley v. School Bd., supra, 345 F.2d at 324 (dissenting opinion). Freedom of choice, in other words, does not mean a choice between a clearly delineated "Negro school" (having an all-Negro faculty and staff) and a "white school" (with all-white faculty and staff). School authorities who have heretofore operated dual school systems for Negroes and whites must assume the duty of eliminating the effects of dualism before a freedom of choice plan can be superimposed upon the pre-existing situation and approved as a final plan of desegregation. It is not enough to open the previously all-white schools to Negro students who desire to go there while all-Negro schools continue to be maintained as such. Inevitably, Negro children will be encouraged to remain in "their school," built for Negroes and maintained for Negroes with all-Negro teachers and administrative personnel. See Bradley v. School Bd., supra, 345 F.2d at 324 (dissenting opinion). This encouragement may be subtle but it is nonetheless discriminatory. The duty rests with the School Board to overcome the discrimination of the past, and the long-established image of the "Negro school" can be overcome under freedom of choice only by the presence of an integrated faculty.

In the instant case the defendants have filed with the Court, as part of their desegregation plan, the following statement regarding staff desegregation.

Teachers, administrative and supervisory staffs hold joint meetings

and joint in-service programs following existing policy. This relationship will continue in the planning and the operation of schools without regard to race, color or national origin. Teachers assigned to teaching positions in the County will be subject to State and local requirements for certification and will be evaluated in terms of their over-all preparation and qualifications for positions desired, on a non-discriminatory basis.

██ The statement does not specifically indicate that teachers will be assigned to *each school* regardless of race. Counsel for the defendants in oral argument, however, have represented to the Court that this is the meaning. Nevertheless, I have concluded that an order should be entered by this Court enjoining the defendants from continuing to maintain segregated faculties and administrative staffs,[6] and that a definite date must be fixed for completion of this desegregation process. Upon the evidence before me I find no justification for delay in this process beyond the current school year. The number of Negro teachers in the school system is small.[7] It should be feasible to desegregate faculties and administrative staffs in the various schools completely for the 1966–67 school term, and I shall so order.

Some guideline must be established for the School Board in carrying out the Court's mandate. Insofar as possible, the percentage of Negro teachers in each school in the system should approximate the percentage of the Negro teachers in the entire system for the 1965–66 school session. Such a guideline can not be rigorously adhered to, of course, but the existence of some standard is necessary in order for the

Court to evaluate the sufficiency of the steps taken by the school authorities pursuant to the Court's order. A similar standard was adopted by the District Court in deciding the school desegregation suit involving Oklahoma City. Dowell v. School Bd., 244 F.Supp. 971, 977–978 (W.D.Okl.1965).

██ If it should be contended that the above guideline constitutes an infringement of the basic constitutional principle that school systems must be operated on a non-racial basis, whereas the standard for teacher assignments here is race-conscious, it is sufficient to note that the guideline to be followed is but a specific mode of relief for discrimination practiced in the past.

Clearly, defendants may consider race in disestablishing their segregated schools without violating the Fourteenth Amendment's equal protection clause. The admonition of the first Mr. Justice Harlan in his dissenting opinion in Plessy v. Ferguson, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) that "Our Constitution is color-blind" was directed against the "separate but equal" doctrine, and its rejection in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, was an explicit recognition that separate educational facilities are inherently unequal, and did not convert Justice Harlan's metaphor into constitutional dogma barring affirmative action to accomplish the purposes of the Fourteenth Amendment. Thus, racial classifications which effect invidious discrimination are forbidden but may be upheld if deemed necessary to accomplish an overriding governmental purpose.

---

6. By the term "administrative staffs" I mean principals and any others who directly serve the pupils. I do not believe students have standing to question the assignment of clerical, custodial or other school personnel. Accord, Mapp v. Board of Educ., 319 F.2d 571, 576 (6th Cir. 1963).

7. According to the answers to interrogatories filed with the Court only 25 Negro teachers taught in the system during the 1964–65 school term. There may have been a slight increase as a result of a rise in school enrollment for the 1965–66 session.

Id., at 981; accord, 42 Ops.Cal.Att'y Gen. 33 (1963), reported, 8 Race Rel.L.Rep. 1303 (1963).

 It may be that continued consideration of racial factors in the assignment of teachers, even for the purpose of furthering integration, would offend the Constitution if there had been no history of discrimination in past assignments, or where the effects of past discrimination may reasonably be said to have been overcome.[8] Certainly any teacher denied employment by a School Board on the basis that good "racial balance" dictated that no additional members of his race be hired at a particular school would have standing to attack the discrimination in the federal courts. But the order of the Court to be entered here envisions no such permanent race consciousness. It is merely intended to give redress for former faculty segregation on the premise that, had there been no discrimination to begin with, the Negro teachers employed by the county would have been as evenly distributed throughout the various schools in the system as, for want of a better analogy, those teachers with blue eyes or cleft chins. The duty of assigning teachers and administrative staff to the various schools in the system rests squarely upon the shoulders of the school authorities. Unlike the pupil situation, there can be no "freedom of choice" plan for teacher and staff assignments. The duty must be squarely and immediately met.

In summary, I hold that the freedom of choice plan proffered by the School Board of Augusta County for the assignment of students in the system is sound under the Fourteenth Amendment upon the conditions heretofore expressed which will allow a continuing, yearly opportunity for each student in the system, or his parent, to make an informed choice. The framework of freedom of choice must be made fair, however, by the integration of teachers and administrative staffs in accordance with the formula I have adopted, and the information furnished to students and parents for the next registration this spring must contain the statement that faculties and staffs will be integrated.

 In approving freedom of choice, I do not intend to foreclose a change of method for the assignment of students if the Augusta County School Board so desires. The School Board may continue under its plan of free assignments and transfers (freedom of choice), or it may use a unitary system of geographic zoning[9] with or without a superimposed plan of free transfers. See Brown v. County School Bd., 346 F.2d 22, 23 (4th Cir. 1965). If either of the former is to be utilized, the guideline heretofore established for teacher desegregation in 1966–67 must be adhered to as nearly as possible. If, however, the School Board desires to use a strictly geographic plan, the question of teacher assignment vis-a-vis the approval of the overall plan becomes less significant. The existence of a unitary geographic plan will not do away with the necessity for teacher and staff integration. See Gilliam v. School Bd., 86 S.Ct. 224 (1965), vacating and remanding 345 F.2d 325 (4th Cir. 1965), where the Court ordered a hearing on teacher assignments although the plan for pupil assignments was geographic. However, where the element of choice of schools is no longer given to the students, it can hardly be contended that they are coerced in their choice by the racial composition of the faculty in any school. Accordingly, in the absence of a showing of gerrymandering district lines

8. Cf. Bell v. School City, 213 F.Supp. 819, 831 (N.D.Ind.), aff'd, 324 F.2d 209 (7th Cir. 1963), cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964). See also Kaplan, Segregation Litigation and the Schools—Part II: The General Northern Problem, 58 Nw. U.L. Rev. 157, 206–07 (1963); Bittker, The Case of the Checker-Board Ordinance:

An Experiment in Race Relations, 71 Yale L.J. 1387, 1391, 1411 (1962).

9. Under a unitary zoning system all schools in the system serve a specific geographic zone. There can be no overlapping or "dual" zones, one zone for Negro students and another zone for whites.

to bring about what would amount to a separate Negro school zone and the exclusive assignment of Negro teachers to that zone (which would appear practically impossible in a primarily rural area like Augusta County where Negro and white residents are spread throughout the county), this Court will not disturb the administrative decision of the School Board in assigning teachers to the various schools under a geographic plan. In short, where a desegregation plan calls for the students to assign themselves, the school authorities must assume the burden of leading in desegregation through the assignment of teachers and staff. Where integration is brought about immediately pursuant to a geographic plan the school authorities may retain free rein in teacher assignments. Indeed, teacher assignments may fairly be allowed to follow the racial composition of each school in the system under a geographic plan in an area like Augusta County with no well-defined predominantly Negro residential area of substantial size.

In order to give the Augusta County School Board the opportunity to consider the Court's decision and to decide upon its future course under the several options herein granted it, an order will be entered in accordance with the rationale of this opinion and instructing the defendants to submit a report on steps taken in furtherance of the order, along with an amended or new plan, upon the completion of pupil and teacher assignments for the 1966–67 school term. The report and plan shall be submitted no later than two months before the opening of the 1966–67 session.

I have examined the prayers for relief in the complaint and find, on the evidence adduced before the Court, that the plaintiffs are entitled to none of the additional relief demanded therein at this time.

The Court will retain jurisdiction of the cause, placing it on the inactive docket. The cause may be reinstated on the active docket without the payment of any filing fee in the event that any of the plaintiffs or anyone who would have

had a right to intervene in the cause had it remained on the active docket shall file a petition for reinstatement and/or intervention stating a claim which would have given such petitioner a right to reopen the cause or intervene had the cause remained on the active docket.

When the defendants have taken the steps ordered by the Court and the course chosen has been approved as a final plan of desegregation, they will be entitled to dissolution of the injunction and final dismissal of the cause.

This opinion and the findings and authorities set forth as herein stated will be treated as findings of fact and conclusions of law and, based upon the opinion, an appropriate order will be entered and filed.